J-S76033-14

2015 PA Super 7

| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellant | |
| v. | |
| DAVID J. BLACK | |
| Appellee | No. 1179 WDA 2014 |

Appeal from the Order Entered July 18, 2014
In the Court of Common Pleas of Fayette County
Criminal Division at No(s): CP-26-CR-0000523-2014

BEFORE:  FORD ELLIOTT, P.J.E., PANELLA AND OLSON, JJ.

OPINION BY OLSON, J.:                    **FILED JANUARY 13, 2015**

The Commonwealth appeals from the order entered on July 18, 2014, granting the petition for writ of *habeas corpus* filed on behalf of David J. Black (hereinafter "Sergeant Black") and dismissing the charge of recklessly endangering another person (hereinafter "REAP").  We vacate and remand for further proceedings.

On February 21, 2014, the Commonwealth filed a criminal complaint against Sergeant Black, accusing him of REAP while he was working at the State Correctional Institute at Fayette (hereinafter "SCI-Fayette").  The attached affidavit of probable cause averred the following:

> On [October 20, 2013, Sergeant Black] did engage in
> conduct which placed another person in danger of death or
> serious bodily injury.  To [w]it:  [Sergeant Black] admitted
> to his immediate supervisor that he opened an empty cell at

[SCI-]Fayette and allowed two inmates to enter for the purpose of "[s]ettling their differences." Inmate Alexander Fulton [(hereinafter "Mr. Fulton")] and Inmate Brandon Duncan [(hereinafter "Mr. Duncan")] entered the empty cell when [Mr. Fulton] struck [Mr. Duncan] in the head with a combination lock that was concealed in a brown knit hat. This caused serious bodily injury to [Mr. Duncan] that required medical attention. Review of cell door reports, video footage[,] and interviews conducted revealed that [Sergeant Black] was alone in the control booth at the time the unoccupied cell was opened and [he] was the only person who could have opened the cell. There were several safeguards in place that would have indicated the cell was unoccupied[, which] include[:] the computer touch screen in the control booth, the count board and the move book, all of which would have told [Sergeant Black] the cell was empty. [All o]ther correction officers on duty at the time were [] aware that the cell [Sergeant Black] opened was empty. This cell was also "capped" which prevents it from being opened [accidentally]. . . .

A [timeline] that was created from these reports shows that [Sergeant Black] was first seen talking with [Mr. Fulton], and then seconds later [Sergeant Black] opened [Mr. Fulton's] locked cell. It is believed that this is when [Mr. Fulton] retrieved the combination lock used in the assault. A few seconds later [Sergeant Black] opened the cell where the assault took place. . . .

After the fight was over, [Sergeant Black] admitted to [Captain] Richard Workman [hereinafter ("Captain Workman")] that he opened the cell door and allowed the inmates to "[s]ettle their differences, but didn't think they would fight." [Sergeant Black] is responsible for maintaining security and safe operations within their unit in accordance with the guidelines established through appropriate departmental and institutional directives, rules[,] regulations[,] policies[,] and special orders. It is [Sergeant Black's] responsibility and duty to provide care, custody[,] and control to the inmates on his post. . . .

Affidavit of Probable Cause, 2/21/14, at 1.

Sergeant Black's preliminary hearing took place on March 17, 2014. During this preliminary hearing, the magisterial district judge heard testimony from Mr. Duncan, Captain Workman, and Criminal Investigator Frank J. Kamalich (hereinafter "Investigator Kamalich").

During the preliminary hearing, Mr. Duncan testified that, at the time of the assault, he was an inmate at SCI-Fayette and was housed on the prison's "F Block."[1]  N.T. Preliminary Hearing, 3/17/14, at 6. Mr. Duncan testified that Mr. Fulton was a fellow inmate at SCI-Fayette and that Mr. Fulton was also housed on F Block. *Id.* at 7.  As Mr. Duncan testified, while Mr. Fulton spent most of his time in a wheelchair, Mr. Fulton was "fully capable" of doing such things as "walking, exercising, [and] working out." *Id.* at 18.  Sergeant Black was the sergeant on F Block. *Id.* at 6.

Mr. Duncan testified that, in the days prior to the assault, he and Mr. Fulton had been at odds.  Specifically, Mr. Duncan testified that:  on or about October 17, 2013, he and Mr. Fulton had "a little verbal altercation;" on October 18, 2013, he and Mr. Fulton "spoke shortly;" and, on October 19, 2013, he and Mr. Fulton had "probably about a . . . five-minute argument." *Id.* at 11.  As to whether Sergeant Black was aware of the animosity between Mr. Duncan and Mr. Fulton, Mr. Duncan testified:  "me and

_____

[1] Mr. Duncan testified that, at the time of the assault, he was 31 years old and was serving a 20 to 40 year term of imprisonment for third-degree murder.  N.T. Preliminary Hearing, 3/17/14, at 17-18.

Sergeant Black never spoke with each other, so I wouldn't be able to say with certainty that [the sergeant] was aware of" the conflict between Mr. Duncan and Mr. Fulton. *Id.* at 11-12.

As Mr. Duncan testified, on the evening of October 19, 2013,[2] the 35 to 40 inmates on F Block were outside of their cells and congregating in the "day room," where they were able to do such things as "[w]atch TV[,] play cards, [or] use the phone." *Id.* at 7 and 14. The evidence demonstrates that, while the inmates were in the day room, the relevant prison cells at issue were locked and could only be opened from the guard's control room. *See id.* at 44-46 and 49-50. Moreover, the evidence demonstrates that, during the relevant time, Sergeant Black was the only prison official in the guard's control room. *Id.* at 54.

Mr. Duncan testified that, while the inmates were congregating in the day room, he saw Sergeant Black in the guard's control room, speaking with Mr. Fulton. *Id.* at 8. Mr. Duncan testified that, after Mr. Fulton spoke to Sergeant Black, Mr. Duncan saw that Mr. Fulton was allowed back into his own cell for "maybe half a minute or whatever." *Id.* at 8. Mr. Duncan then witnessed Mr. Fulton exit his cell, roll his wheelchair toward an empty cell "in

_____

[2] Both Mr. Duncan and Captain Workman testified that the assault occurred on October 19, 2013. However, Investigator Kamalich testified that the assault occurred on October 20, 2013.

the back of the block," exit his wheelchair, and walk into the empty cell. *Id.* at 8-9.

According to Mr. Duncan, after Mr. Fulton was inside of the rear prison cell, Mr. Fulton "screamed" for Mr. Duncan's attention. *Id.* at 20. Mr. Duncan testified that he arose from his seat and walked toward the rear prison cell. When he reached the cell, Mr. Duncan testified that he heard the "clack-clack" of the prison cell door unlocking. *Id.* at 9. The door then opened, with Mr. Fulton standing inside of the darkened prison cell. *Id.* at 20.

With the door to the cell open, Mr. Duncan asked Mr. Fulton "[w]hat's going on?," with Mr. Fulton replying "[n]othing, I just want to rumble." *Id.* At that point, Mr. Duncan testified, he felt as though prison culture left him with "no other choice but to go in . . . that cell" and fight Mr. Fulton. *Id.* at 32. Mr. Duncan testified:

> If I wouldn't have [gone back there and fought him], I'd be like the biggest coward, like in the jail, if I'd just sat there and the cell opened up and he's in there, and I'm just like, "Okay, now, I'm cool. I'm not going in there and fight him." You know. . . . I just felt like, you know, that my back was up against a wall. Like, now, the cell's opened up. You either go in there or, you know, like I'd be a coward.

*Id.* at 14-15 and 33.

Mr. Duncan testified that he walked into the cell, turned on the light, and – at that moment – was struck in the back of his head with a combination lock that was swung, by Mr. Fulton, from inside of a winter hat.

*Id.* at 10 and 27. As Mr. Duncan testified, after Mr. Fulton struck him with the lock: "We fight. I held his hand trying to get the lock off of him. I hit him a couple times, and a couple [correctional officers] came in there and broke the fight up." *Id.* at 10.

Mr. Duncan testified that the assault caused him to suffer a gash to his head, which required six staples to close. *Id.* at 11.

Captain Workman next testified at the preliminary hearing. Captain Workman testified that, on the night of October 19, 2013, he was the shift commander at SCI-Fayette. According to Captain Workman:

> At approximately 2000 hours, I received a phone call from Sergeant Black from . . . F Unit – that's his regular unit. And he said he wanted to discuss an incident with me but not over the telephone. He said he wanted to meet me on the walks. And I told him, I said, "No," I said, "Tell me what's going on." And he said that he had messed up. He said he let an inmate into a cell, two [] inmates fought, and that's what had happened. So, then, I told him, I said, "Well, what I'll do is, I'm going to send Lieutenants down. They're going to collect the inmates. They're going to take them to medical to be assessed for injuries, then they'll be processed into the RHU." And, then, I told Sergeant Black, I said, "Make sure your misconducts and your 121's are in order and get them to Control when completed."

*Id.* at 36-37.

The evidence at the preliminary hearing indicates that the fight between Mr. Fulton and Mr. Duncan occurred at approximately 7:45 p.m. and that Captain Workman received the above-summarized telephone call at approximately 8:06 p.m. *Id.* at 51-52. However, Captain Workman testified, in those intervening 21 minutes, no other prison official had been

informed of the fight between Mr. Fulton and Mr. Duncan – including those in the medical department. *Id.* at 37-38. Captain Workman testified that this delay in notification was contrary to established prison procedure. According to Captain Workman:

> If inmates fight, as soon as it's discovered, then the person would call Control and say, "Hey, we got a fight." That way, you know to dispatch officers as needed to stop it. The inmates are then secured, then they'll go to RHU – or medical to be assessed for injuries, then they'll be processed into the RHU.

*Id.* at 37.

Captain Workman testified that, later on that night, he was doing his rounds in the prison when Sergeant Black approached him to talk. Captain Workman testified:

> [Sergeant Black] asked me if he could talk to me, and I said, "Yeah, you can talk to me." And then he said that he thought that the inmate still lived in that cell where the fight occurred, and that he didn't know that they were going to fight. He said they went in there to settle a difference, but he didn't think they were going to fight. He told me, he said, "You know, I'm going to be honest with you. I don't want to lie to you." And I stopped him, I said, "Listen, security is going to be looking into this." I said, "When security questions you, go ahead and tell the truth," and then I went and completed my rounds.

*Id.* at 38-39.

Captain Workman explained that the fight occurred in a "capped" prison cell – which, in this case, meant that the cell was unoccupied and that it would not open unless it was specifically unlocked by the guard in the control room. *Id.* at 44-45. Captain Workman testified that there would

have been no "reason when inmates are in the day room to allow inmates into an empty or vacant cell." *Id.*

The final witness to testify at the preliminary hearing was Investigator Kamalich. Investigator Kamalich testified that he is a criminal investigator for the Department of Corrections' Office of Special Investigations Intelligence and that he investigated the actions of SCI-Fayette's employees on the night of October 20, 2013.[3] *Id.* at 47. Investigator Kamalich testified that the video surveillance, electronic prison cell "door reports,"[4] and interviews revealed the following:

> if you recall from [Mr. Duncan's] testimony, [Mr. Duncan and Mr. Fulton] had their final disagreement, and that's when [Mr. Fulton] went up to the bubble[5] and talked with Sergeant Black up at the bubble. The video shows, [Mr. Fulton] then turns from there and heads behind [Mr. Duncan] who's seated in the day room.
>
> . . .
>
> And you see [Mr.] Fulton go behind [Mr. Duncan] and then go into his cell. And I believe that he was in there for [41]

---

[3] Investigator Kamalich testified that the Department of Corrections' Office of Special Investigations Intelligence is similar to a law enforcement agency's internal affairs division. N.T. Preliminary Hearing, 3/17/14, at 47. Investigator Kamalich testified that he "[doesn't] literally deal with inmates. [He] deal[s] with employees – staff." *Id.*

[4] Investigator Kamalich testified that "[e]very time a door opens and closes, it generates a report." N.T. Preliminary Hearing, 3/17/14, at 48.

[5] The "bubble" is prison vernacular for the guard's control booth. N.T. Preliminary Hearing, 3/17/14, at 8.

seconds. Then, you see him come back out of the cell, and you see it close. . . . [Mr. Fulton] turns to the right to head back to the cell that they fought in. . . . [17] seconds after [Mr. Fulton left his cell, the vacant cell – numbered cell 108 – opened].

. . .

Officer Cercone tells me that he was out back smoking [when all of this occurred]. . . . [Officer Cercone] was returning back to [his station] when he saw Sergeant Black sort of rushing out of the bubble headed back towards the 108 cell. He doesn't know what's going on. He follows Sergeant Black and Officer Bigelow back to that cell where they find [Mr.] Duncan and [Mr.] Fulton fighting, and they get in there and they break up the fight. Now, [Officer] Cercone tells me that they just let [Mr.] Fulton to go lock in his cell which is around the corner, 115 cell, but they didn't take the lock or anything off of him or pat him down or search him. He should have been cuffed right there. That's the policy, and that's when [Captain] Workman should have been called when, in fact, [Captain] Workman wasn't called for [21] minutes after that happened.

*Id.* at 49-51.

Investigator Kamalich indicated that Sergeant Black should have known that cell 108 was vacant and that Sergeant Black should not have opened the cell for either Mr. Fulton or Mr. Duncan. According to Investigator Kamalich:

this is [Sergeant Black's] regular gig. This is where he works every day, in this F Block. Not only do you know your inmates, you know what cell they're in, you know what cells are empty. Now, there's several things that [would have indicated that cell 108 was vacant]. There's what they call a count board. There's a huge board as you walk inside the bubble where the Sergeant usually works, and it shows who's in each cell, and they also have a line through if there's an empty cell. That's one way. There's also what they call a move book. The move book would show that if

an inmate moved while Sergeant Black was on duty, clearly it would show that. It's his responsibility to review that material when he changed shifts. . . . The third way would be, they have an automatic touch screen inside the control bubble; and, when a door is capped, as [Captain] Workman explained to you, there's a light that indicates on there if it's a capped cell. There's a reason it's capped, because it's empty; because, when they would do what they call a group release and open up a whole range of doors, that would prevent that empty cell from opening.

*Id.* at 52-53.

At the conclusion of the preliminary hearing, the magisterial district judge bound Sergeant Black over for court on the charge of REAP. *Id.* at 67.

On April 21, 2014, Sergeant Black filed an "omnibus pre[-]trial motion for relief in the nature of a writ of *habeas corpus* and in the nature of a motion to dismiss based upon a lack of evidence to make a *prima facie* case" (hereinafter "Sergeant Black's petition for writ of *habeas corpus*"). Sergeant Black's petition for writ of *habeas corpus*, 4/21/14, at 1 (some internal capitalization omitted) (internal italicization added). Within Sergeant Black's petition for writ of *habeas corpus*, Sergeant Black claimed that "[t]he Commonwealth failed to meet its *prima facie* case to establish that [Sergeant Black] committed the crime of [REAP] . . . [because the Commonwealth] . . . offered [no] evidence to show that [Sergeant Black] knew that the two inmates were going to fight, knew that either inmate was accompanied by a weapon, or acted any differently in his response to the fight." *Id.* at 2-3.

On June 9, 2014, the trial court held a hearing on Sergeant Black's petition for writ of *habeas corpus*, during which time the Commonwealth introduced the transcript from the March 17, 2014 preliminary hearing and Sergeant Black introduced two written statements that Mr. Fulton gave to investigators.[6]  N.T. *Habeas Corpus* Hearing, 6/9/14, at 2-7.  The hearing then concluded without the introduction of any new testimony.

On July 18, 2014, the trial court entered an order granting Sergeant Black's petition for writ of *habeas corpus* and dismissing the charge of REAP. Within the trial court's contemporaneously filed opinion, the trial court explained that it was granting Sergeant Black relief because it found that "[Mr.] Fulton asked [Sergeant Black] to open the cell so that he could get some food from the cell" and that "[Sergeant Black] was not aware that [Mr.] Fulton planned to fight with [Mr.] Duncan."  Trial Court Opinion, 7/18/14, at 2.  As a result of these factual findings and credibility determinations, the trial court concluded that it is "establish[ed]" that Sergeant Black "was unaware that the cell was being opened so that a fight could take place."  *Id.* at 3-4.  The trial court thus concluded that "the Commonwealth failed to sustain its burden that [the crime of REAP] had been committed."  *Id.* at 4.

---

[6] The written statements that Mr. Fulton gave to the investigators are not included in the certified record.

The Commonwealth filed a timely notice of appeal and now raises the following claim to this Court:

> Whether the [trial] court erred in granting [Sergeant Black's] pre[-]trial motion to dismiss when the Commonwealth established a *prima facie* case that [Sergeant Black] consciously disregarded a known risk of death or serious[] bodily injury to the victim[?]

The Commonwealth's Brief at 1 (some internal capitalization omitted).

As this Court has explained:

> The decision to grant or deny a petition for writ of *habeas corpus* will be reversed on appeal only for a manifest abuse of discretion. It is settled that a petition for writ of *habeas corpus* is the proper means for testing a pre-trial finding that the Commonwealth has sufficient evidence to establish a *prima facie* case. Although a *habeas corpus* hearing is similar to a preliminary hearing, in a *habeas corpus* proceeding the Commonwealth has the opportunity to present additional evidence to establish that the defendant has committed the elements of the offense charged. . . .
>
> A *prima facie* case consists of evidence, read in the light most favorable to the Commonwealth, that sufficiently establishes both the commission of a crime and that the accused is probably the perpetrator of that crime. The Commonwealth need not prove the defendant's guilt beyond a reasonable doubt. Rather, the Commonwealth must show sufficient probable cause that the defendant committed the offense, and the evidence should be such that if presented at trial, and accepted as true, the judge would be warranted in allowing the case to go to the jury.

***Commonwealth v. Fountain***, 811 A.2d 24, 25-26 (Pa. Super. 2002) (internal quotations and citations omitted).

We have held that "[i]n determining the presence or absence of a *prima facie* case, inferences reasonably drawn from the evidence of record

- 12 -

that would support a verdict of guilty are to be given effect, but suspicion and conjecture are not evidence and are unacceptable as such." ***Commonwealth v. Hendricks***, 927 A.2d 289, 291 (Pa. Super. 2007) (internal quotations and citations omitted). Further, since a trial court must view the evidence in the light most favorable to the Commonwealth when ruling upon a petition for writ of *habeas corpus*, "it is inappropriate for the trial court to make credibility determinations in deciding whether the Commonwealth established a *prima facie* case." ***Commonwealth v. Landis***, 48 A.3d 432, 448 (Pa. Super. 2012).

On appeal, the Commonwealth claims that the trial court erred when it granted Sergeant Black's petition for writ of *habeas corpus*. According to the Commonwealth, when the record is viewed in the proper light, it demonstrates that the Commonwealth presented a *prima facie* case that Sergeant Black committed the crime of REAP. As the Commonwealth argues:

> [Sergeant Black] placed [Mr. Duncan] in [a "capped" cell] with an inmate [Mr. Duncan] had issues with who was given the opportunity to go to his cell moments before [the] cell was opened. [Sergeant Black's] actions allowed [Mr.] Duncan's assailant to arm himself and gave him a [vacant] cell to settle differences. . . . [Sergeant Black] created a ring and threw [Mr.] Duncan in it with an inmate who had the opportunity to gather a weapon, thus [Sergeant Black] consciously disregarded a risk of death or serious bodily injury.

The Commonwealth's Brief at 6-7.

We agree with the Commonwealth and, therefore, we vacate the trial court's order and remand for further proceedings.

The Commonwealth charged Sergeant Black with REAP, which is defined in the following manner:

§ 2705. Recklessly endangering another person

A person commits a misdemeanor of the second degree if he recklessly engages in conduct which places or may place another person in danger of death or serious bodily injury.

18 Pa.C.S.A. § 2705.

"Serious bodily injury" is defined as "[b]odily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." 18 Pa.C.S.A. § 2301. "Bodily injury" is defined as an "[i]mpairment of physical condition or substantial pain." *Id.*

This Court has explained that the crime of REAP is "directed against reckless conduct entailing a serious risk to life or limb out of proportion to any utility the conduct might have." *Commonwealth v. Vogelsong*, 90 A.3d 717, 719 (Pa. Super. 2014) (internal quotations and citations omitted). For the Commonwealth to establish a *prima facie* case of REAP, the evidence must show that "the defendant had an actual present ability to inflict harm and not merely the apparent ability to do so. Danger, not merely the apprehension of danger, must be created." *Commonwealth v. Martuscelli*, 54 A.3d 940, 949 (Pa. Super. 2012). However, as we have explained, "[i]t is not [the defendant himself] that must be [shown] to have

- 14 -

the present ability to cause death or serious bodily injury to another, it is [the defendant's] actions." ***Vogelsong***, 90 A.3d at 721 (defendant's action of allowing her horse to roam freely on a roadway was sufficient to sustain a conviction for REAP).

The *mens rea* for REAP is recklessness. Under the Crimes Code, a person acts recklessly with respect to a material element of an offense when:

> he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and intent of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation.

18 Pa.C.S.A. § 302(b)(3).

Thus, to establish a *prima facie* case of REAP against Sergeant Black, the Commonwealth must demonstrate that Sergeant Black consciously disregarded a substantial and unjustifiable risk that his conduct "placed or may have placed [Mr. Duncan] in danger of serious bodily injury or death." ***Vogelsong***, 90 A.3d at 721.

At the outset, we conclude that the trial court erred when it made factual findings and credibility determinations from the evidence that was presented during the *habeas corpus* hearing. As was explained above, the trial court granted Sergeant Black's petition for writ of *habeas corpus* and dismissed the REAP charge against Sergeant Black primarily because the

- 15 -

court had reached three factual findings: that "[Mr.] Fulton asked [Sergeant Black] to open the cell so that he could get some food from the cell;" that "[Sergeant Black] was not aware that [Mr.] Fulton planned to fight with [Mr.] Duncan;" and, that Sergeant Black "was unaware that the cell was being opened so that a fight could take place." Trial Court Opinion, 7/18/14, at 2-4. These factual determinations were apparently garnered from statements that Mr. Fulton made to investigators – and that Sergeant Black introduced, on his own behalf, during the *habeas corpus* hearing. **See** Trial Court Opinion, 7/18/14, at 2 (trial court citing to Mr. Fulton's statements as supporting its factual findings).

However, as we have explained, Mr. Fulton's statements were not included in the certified record to this Court. Moreover, to the extent Mr. Fulton's statements support Sergeant Black's version of the events, the statements were irrelevant to deciding Sergeant Black's petition for writ of *habeas corpus* and are irrelevant to deciding the instant appeal. **See Commonwealth v. Fountain**, 811 A.2d 24, 25 (Pa. Super. 2002) ("[a] *prima facie* case consists of evidence, **read in the light most favorable to the Commonwealth**, that sufficiently establishes both the commission of a crime and that the accused is probably the perpetrator of that crime") (emphasis added) (internal quotations and citations omitted); **Commonwealth v. Wojdak**, 466 A.2d 991, 997 (Pa. 1983) ("the weight and credibility of the evidence are not factors" for determining whether the Commonwealth has presented a *prima facie* case).

The trial court thus erred when it made credibility determinations and concluded that Mr. Fulton's (alleged) statements to the investigators were true. Simply stated, the credibility of Mr. Fulton's statements could not and should not have been considered when determining whether the Commonwealth presented a *prima facie* case against Sergeant Black. **Wojdak**, 466 A.2d at 997.

Further, we conclude that, when the evidence is viewed in the light most favorable to the Commonwealth, the evidence "sufficiently establishes both the commission of [the] crime [of REAP] and that [Sergeant Black wa]s probably the perpetrator of that crime." **Fountain**, 811 A.2d at 25-26.

Viewed in the light most favorable to the Commonwealth, the direct evidence in this case demonstrates the following: in the days prior to the assault, Mr. Duncan and Mr. Fulton had been verbally hostile to one another; immediately prior to and during the assault, the inmates on F Block were in the "day room" and were locked out of their cells; immediately prior to and during the assault, Sergeant Black was the only corrections officer who was in the guard's control room and Sergeant Black was the only individual who could have opened the locked prison cells; Mr. Fulton spoke with Sergeant Black minutes prior to the assault; immediately after Mr. Fulton spoke with Sergeant Black, Sergeant Black opened Mr. Fulton's cell and allowed Mr. Fulton to enter his cell; Mr. Fulton was inside of his cell for 41 seconds; after Mr. Fulton left his cell, Mr. Fulton immediately went down to the end of the hall, where Sergeant Black opened a vacant, "capped" cell for Mr. Fulton;

when Sergeant Black opened the "capped" cell, Sergeant Black knew that Mr. Fulton intended to use the cell to "settle a difference" with Mr. Duncan; after Mr. Fulton entered the cell, Mr. Fulton "screamed" for Mr. Duncan's attention – while 35 to 40 inmates congregated in the day room; Mr. Duncan walked back to the cell where Mr. Fulton was waiting and, when Mr. Duncan got back to the cell, Sergeant Black opened the cell for Mr. Duncan to enter; when Sergeant Black opened the cell door, Mr. Duncan felt as though prison culture left him with "no other choice but to go in . . . that cell" and fight Mr. Fulton; Mr. Duncan entered the cell, turned around to turn on the light to the darkened cell, and was struck in the back of his head with a combination lock that was swung, by Mr. Fulton, from inside of a winter hat; and, the assault caused Mr. Duncan to suffer a gash to the back of his head, which required six staples to close.

A number of reasonable inferences may be drawn from this direct evidence. Again, viewing the evidence in the light most favorable to the Commonwealth which we must do, these inferences include: Sergeant Black knew that Mr. Fulton was going to use the "capped" cell to fight Mr. Duncan; Sergeant Black not only knew that Mr. Fulton was going into the fight armed with a weapon, but Sergeant Black enabled Mr. Fulton to arm himself with a combination lock in preparation for the fight; Sergeant Black knew that, when he unlocked the "capped" cell door, there was a substantial risk that, in view of the culture within the prison, Mr. Duncan would be forced to enter the cell and accede to the fight with Mr. Fulton; and, Sergeant Black knew

that Mr. Duncan was going into the fight weaponless, against a weapon-wielding opponent.

Obviously, we have a limited record at this stage and the above inferences are not the only inferences that may be drawn. A fact finder at trial may reach a different conclusion. However, when the evidence is viewed in the light most favorable to the Commonwealth, the above inferences are reasonable and are sufficient to support a *prima facie* case that Sergeant Black consciously disregarded a substantial and unjustifiable risk that his conduct "placed or may have placed [Mr. Duncan] in danger of serious bodily injury or death." ***Vogelsong***, 90 A.3d at 721.

The evidence is thus sufficient to establish a *prima facie* case against Sergeant Black, with respect to the crime of REAP. The trial court erred in concluding otherwise.

Order vacated. Case remanded. Jurisdiction relinquished.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: 1/13/2015