**Commonwealth v. Bartholomew**

C.P. of Lehigh County, No. CR-599/2014

*Charles Gallagher*, for Commonwealth.
*Ronald Creazzo*, for defendant.

STEINBERG, *J.*, June 19, 2015—The defendant, Scott Bartholomew, is charged with Theft by Unlawful Taking or Disposition, Theft by Failure to Make Required Disposition of Funds Received, Receiving Stolen Property, and Dealing in Proceeds of Unlawful Activities.[1] It is alleged that the defendant misappropriated large sums of money from his elderly uncle, Wilbur Stiles.

---

1. The Commonwealth filed a "Motion To Amend The Bill Of Information" on October 29, 2014. A hearing was held on that motion on February 4, 2015, and the Commonwealth was permitted to do so with the exception of Count six (6) which was a charge of Criminal Conspiracy between the defendant and Judy Bartholomew. On March 10, 2015, the Commonwealth filed its Amended Information. Trial is scheduled for October 5, 2015. *See generally Commonwealth v. Beck*, 78 A.3d 656, 660-661 (Pa. Super. 2013).

On April 10, 2014, counsel for the defendant filed an "Omnibus Pre-Trial Motion For Relief," which contained seventy-seven (77) paragraphs, and was divided into fifteen (15) separate subsections. Counsel also filed an "Addendum To Omnibus Pre-Trial Motion For Relief" on February 24, 2015. Hearings were held on those motions, which could be characterized broadly as claims relating to the following: (1) Motion to Dismiss — Statute of Limitations;[2] (2) Habeas Corpus;[3] (3) Motion To Suppress Physical Evidence;[4] (4) Motion To Suppress Physical Evidence — Chain of Custody;[5] (5) Motion To Suppress Statements;[6] (6) Motion To Suppress Information In Toto;[7] (7) Motion In Limine;[8] (8) Lack of Jurisdiction — Detective Renee Castellani;[9] (9) Lack of Jurisdiction — transactions outside Commonwealth of Pennsylvania.[10] Many of the claims were resolved during hearings held in this matter,[11] and this Opinion will only address the Motion To Suppress Statements, Habeas Corpus, and Statute of Limitations claims.

---

2. Omnibus Pre-Trial Motion For Relief (hereinafter OPTM), ¶¶ 1-26.

3. *Id.* at ¶¶ 27-58.

4. *Id.* at ¶¶ 59-61.

5. *Id.* at ¶¶ 62-64.

6. *Id.* at ¶¶ 65-69.

7. OPTM, ¶¶ 70-75.

8. *Id.* at ¶¶ 76-77.

9. Addendum To Omnibus Pre-Trial Motion For Relief, ¶¶ 78-85.

10. *Id.* at ¶¶ 86-88.

11. On March 10, 2015, the claims raised in the "Addendum To Omnibus Pre-Trial Motion For Relief" were denied. On May 12, 2015, the "Motion to Suppress Physical Evidence" and "Motion to Suppress Physical Evidence — Chain of Custody" were withdrawn and dismissed. Additionally, the "Motion to Suppress Information in Toto" was denied. The "Motion in Limine," which pertained to editing the preserved testimony of Wilbur Stiles, was deferred in order to determine if any of his testimony should be redacted.

## I. Motion To Suppress Statements

### A. Statements to Detective Castellani

Detective Renee Castellani is employed by the Lackawanna County District Attorney's Office, and is assigned to the Elder Abuse Unit of the Special Victims Division. During the month of July, 2012, she received a referral from their Area Agency on Aging pertaining to Wilbur Stiles. On July 30, 2012, as part of her investigation, the defendant was interviewed at the Lackawanna District Attorney's Office. The defendant was advised of his *Miranda* rights and he executed a Rights Warning and Waiver form.[12] The defendant told Detective Castellani that he moved in with his uncle, Wilbur Stiles, in 2003, due to his uncle's health issues. The same year, they met with a lawyer and the defendant was named power of attorney for Wilbur Stiles.[13] The defendant claimed that he did not use the power of attorney until 2008, when his uncle was having difficulty writing checks. He told Detective Castellani that he did not read the power of attorney and failed to comply with the agreement.[14] In that regard, the defendant admitted that Mr. Stiles' money was used to support both himself and his wife.[15]

The interview with the defendant lasted approximately forty-five (45) minutes. At the conclusion of the interview, the defendant departed without arrest.[16]

---

12. Notes of Testimony, Pre-Trial hearing (hereinafter N.T.P.T.H.), 2/4/15, pp. 52-54, 59.
13. *Id.* at p. 54.
14. *Id.* at p. 55.
15. *Id.* at p. 56.
16. *Id.* at pp. 57, 59.

## B. Statements to Lieutenant Sorrentino

On December 10, 2012, Lieutenant Sorrentino spoke to the defendant about Joan Bartholomew, the defendant's mother, who was a resident at Cedarbrook.[17] The interview took place at the South Whitehall Police Headquarters and lasted approximately 30 — 40 minutes.[18]

During the discussion, the defendant told Lieutenant Sorrentino that he was also the power of attorney for Wilbur Stiles. Lieutenant Sorrentino knew nothing about Wilbur Stiles until the defendant mentioned him in their discussion.[19] Their conversation concerning Wilbur Stiles was limited and relatively innocuous, and at its conclusion, the defendant departed the police station.

## C. Discussion

The defendant contends that his interview with Detective Castellani was not preceded by *Miranda* warnings. In fact, Detective Castellani testified that the defendant was advised of his *Miranda* rights and executed a Rights Warning and Waiver document.[20] No evidence to the contrary was presented at the suppression hearing.

Lieutenant Sorrentino, during his interview with the defendant, did not advise him of his *Miranda* warnings. He was not required to do so because the defendant was not subject to custodial interrogation. *Miranda* warnings are only required as part of a custodial interrogation. *Commonwealth v. Housman*, 986 A.2d 822, 839 (Pa. 2009). Custodial interrogation has been defined as

---

17. N.T.P.T.H., pp. 89-90.
18. *Id.* at p. 94.
19. *Id.* at p. 93.
20. N.T.P.T.H., 2/4/15, pp. 52-53, 59.

"questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his [or her] freedom of action in any significant way." *Commonwealth v. Mannion*, 725 A.2d 196, 200 (Pa. Super. 1999); *see also Commonwealth v. Gonzalez*, 979 A.2d 879, 887-888 (Pa. Super. 2009) *quoting Miranda v. Arizona*, 384 U.S. 436, 444 (1996). The United States Supreme Court has stated the "ultimate inquiry is...whether there [was] a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *Commonwealth v. Boczkowski*, 846 A.2d 75, 90 (Pa. 2004) *quoting Stansbury v. California*, 511 U.S. 318, 322 (1994).

"The standard for determining whether an encounter with the police is deemed 'custodial' . . . is an objective one based on a totality of the circumstances with due consideration given to the reasonable impression conveyed to the person interrogated." *Commonwealth v. Johnson*, 42 A.3d 1017, 1028 (Pa. 2012); *Commonwealth v. Busch*, 713 A.2d 97, 99 (Pa. Super. 1998). It was explained in further detail in *Stansbury*, "that the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California*, 511 U.S. at 322-323. In *Commonwealth v. Baker*, 24 A.3d 1006, 1019-1020 (Pa. Super. 2011) citing *Commonwealth v. Mannion*, 725 A.2d at 200, the following factors were identified to determine under the totality of the circumstances whether a detention has become so coercive to constitute the functional equivalent of an arrest:

[T]he basis for the detention; its length; its location; whether the suspect was transported against his or her

will, how far, and why; whether restraints were used; whether the law enforcement officer showed, threatened or used force; and the investigative methods employed to confirm or dispel suspicions.

*Id.*; *see also Commonwealth v. Williams*, 941 A.2d 14, 30 (Pa. Super. 2008); *see also Commonwealth v. Watkins*, 750 A.2d 308, 313 (Pa. Super. 2000).

Finally, in *Howes v. Fields*, 132 S.Ct. 1181, 1189 (2012) it was similarly explained:

As used in our *Miranda* case law, 'custody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion. In determining whether a person is in custody in this sense, the initial step is to ascertain whether, in light of the objective circumstances of the interrogation a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave. And in order to determine how a suspect would have gauge[d] his freedom of movement courts must examine all of the circumstances surrounding the interrogation. Relevant factors include the location of the questioning, its duration, statements made during the interview, the presence of absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning.

*Id.* (internal quotations and citations omitted).

In the case at hand, both interviews with the defendant lasted less than an hour and ended with the defendant's departure from both the District Attorney's Office and the South Whitehall Police Department. He arrived and departed on his own, without any interference by law

enforcement. No handcuffs or other physical restraints were used during the interviews. *See Commonwealth v. Gibson*, 720 A.2d 473, 480 (Pa. 1998)(Statements during interview were not the product of custodial interrogation where defendant agreed to go to police station and talk to officers, and drove to the police station; defendant was not restrained in any way nor was he subjected to force or the threat of force; the door to interview was not locked); *Commonwealth v. Hunzer*, 868 A.2d 498 (Pa. Super. 2005) (The defendant, who voluntarily appeared at the police station, was not subject to custodial interrogation even though he was provided with *Miranda* warnings).

Lieutenant Sorrentino's interview with the defendant concerned the defendant's mother, Joan Bartholomew, not Wilbur Stiles. No investigation was being conducted by him regarding Wilbur Stiles until after the interview. The defendant was asked to come to the police station to discuss "current events with Cedarbrook and his mother."[21] He was told that he was not under arrest, and was free to leave.[22] Lieutenant Sorrentino treated it as an "informational session"[23] and not an interrogation. Nothing presented supports the claim that the defendant was the subject of a custodial interrogation requiring Miranda warnings.

Finally, Detective Castellani's decision to provide *Miranda* warnings did not transform her interview with the defendant into a custodial interrogation. Her cautious approach to conducting interviews does not support the conclusion that the defendant was in custody. *See Commonwealth v. Lark*, 477 A.2d 857, 861 (Pa. 1984).

21. N.T.P.T.H., 2/4/15, p. 87.
22. *Id.* at p. 89.
23. *Id.*

Furthermore, the custodial interrogation analysis as it pertains to the statements provided to Detective Castellani is superfluous. Any statements secured after administering *Miranda* rights are admissible provided the accused's right to remain silent and right to counsel have been explained, and the accused has knowingly and voluntarily waived those rights. *Commonwealth v. Davis*, 861 A.2d 310, 317 (Pa. Super. 2004) citing *Commonwealth v. Jones*, 683 A.2d 1181, 1189 (Pa. 1996). The evidence supports Detective Castellani's administration of the *Miranda* warnings, and the defendant's voluntary relinquishment of those rights.

## II. Motion To Dismiss (Habeas Corpus)

The defendant contends that the evidence "adduced at the Preliminary Hearing did not establish the charged offense[s],"[24] and the charges should be dismissed. A variety of reasons are alleged by the defense to support their motion, including the following: (1) The defendant acted under a "lawful and valid General Durable Power of Attorney executed by Wilbur Stiles in 2003";[25] (2) The Debit/Credit Card usage does not amount to $83,972.60;[26] (3) The redeemed saving bonds were deposited in Wilbur Stiles account;[27] (4) No evidence was presented that Wilbur Stiles gave the defendant $6,050.00 to pay for Cedarbrook services."[28]

It is well-settled that a petition for writ of habeas corpus is the proper means for testing a pretrial finding that the Commonwealth has sufficient evidence to establish a *prima facie* case. *Commonwealth v. Black*, 108 A.3d 70, 77 (Pa.

---

24. OPTM, ¶¶ 37, 39, 44, 46, 50, 58.
25. *Id.* at ¶¶ 28, 30, 42.
26. *Id.* at ¶ 32.
27. *Id.* at ¶ 41.
28. *Id.* at ¶53-54.

Super. 2015); *Commonwealth v. Hendricks*, 927 A.2d 289, 290-291 (Pa. Super. 2007). However, the Commonwealth, at this stage of the proceedings, is not required to establish the defendant's guilt beyond a reasonable doubt. Instead, it is only required to present a *prima facie* showing that a crime has been committed and that the accused is the one who committed it. *Commonwealth v. Fountain*, 811 A.2d 24, 25-26 (Pa. Super. 2002); *Commonwealth v. Wojdak*, 466 A.2d 991, 1000 (Pa. 1983). It has been frequently explained:

> The Commonwealth must show sufficient probable cause that the defendant committed the offense, and the evidence should be such that if presented at trial, and accepted as true, the judge would be warranted in allowing the case to go to the jury. When deciding whether a *prima facie* case was established, the evidence [must be viewed] in the light most favorable to the Commonwealth, and all reasonable inferences based on that evidence which could support a guilty verdict [must be considered].

*Commonwealth v. Barnes*, 14 A.3d 128, 130 (Pa. Super. 2011) quoting *Commonwealth v. James*, 863 A.2d 1179, 1182 (Pa. Super. 2004)(en banc). *See also Commonwealth v. McCullough*, 86 A.3d 901, 905 (Pa. Super. 2014)("[T]he *prima facie* case merely requires evidence of the existence of each element of the crime charged"); *Commonwealth v. Williams*, 911 A.2d 548,550-551 (Pa. Super. 2006). Additionally, the Commonwealth in a habeas corpus proceeding has the "opportunity to present additional evidence to establish that the defendant has committed the elements of the offense[s] charged..." *Black*, 108 A.3d at 77.

In the present case, the testimony from the preliminary hearing, including the preserved testimony[29] of Wilbur Stiles, and the testimony from the habeas corpus hearing, revealed that Wilbur Stiles, who is currently 95 years old, was a wildlife biologist who was employed by the Department of the Interior. He also served in the Air Force during World War II. During his lifetime, he accumulated substantial savings and owned a home at 4658 Shuler Street, Allentown, Pennsylvania. Following the appointment of the defendant as his power of attorney in 2003,[30] his savings dwindled, his residence was put into foreclosure, and Mr. Stiles found himself in a nursing facility. A report prepared by the Institute on Protective Services, which is a collaborative effort between the Department of Aging and Temple University, disclosed that after the defendant was appointed power of attorney, he used the vast amount of Wilbur Stiles' funds for his own benefit.[31] He even neglected to pay for the care of Wilbur Stiles at the Gino Merli Veterans Home, even though funds of Mr. Stiles were readily available to do so.[32] Instead, the defendant converted those funds to his own use.

The defendant was removed as power of attorney effective February 14, 2012.[33] Attorney Sarah Andrew, who specializes in elder law, represented Lynda Allegra, a

---

29. On December 4, 2013, this Court, after a contested hearing, permitted the testimony of Wilbur Stiles to be taken and preserved as set forth in Pa.R.Crim.P. 500. Mr. Stiles testified under oath on January 20, 2014 at the Gino Merli Veterans Center in Scranton, Pennsylvania in the presence of this Court, counsel for the defendant and the Commonwealth, and the police prosecutor.

30. *See* Commonwealth's Exhibit 3, General Durable Power Of Attorney dated October 21, 2003.

31. Case Report of Linda S. Mill, Certified Fraud Examiner (hereinafter Case Report).

32. *Id.* at p. 5.

33. *See* Commonwealth's Exhibit 4.

relative of Mr. Stiles, and filed a petition with the Orphans Court of Lehigh County to compel the defendant "to produce an accounting of the actions he had taken under Power of Attorney for Wilbur Stiles."[34] The defendant, who was ordered to file an accounting by Judge Brian Johnson on October 23, 2012, failed to do so, and was held in contempt of court.[35]

Attorney Andrew filed a "First Amended Petition To Compel An Accounting..." on August 13, 2013, which in detail outlines the defendant's self-dealing with respect to Mr. Stiles assets. For example, the home at 4658 Shuler Street was owned by Mr. Stiles as of June 21, 1985 without any encumbrances until the defendant was appointed power of attorney. Three separate mortgages encumbered the property since 2005, two of which totaling $229,846.00 were in arrears on the date Attorney Andrew filed her petition.[36] The mortgages had not been paid since 2011.[37]

On December 17, 2014, Judge Johnson, in his Adjudication held "that during his tenure as agent under power of attorney for Wilbur Stiles[,] Scott Bartholomew impermissibly comingled his principal's funds with his own, failed to keep accurate records and expended the funds of Wilbur Stiles for the benefit of himself or persons other than Wilbur Stiles..."[38] A surcharge was imposed on the defendant in the amount of $238,142.51.

The report of Certified Fraud Examiner Linda Mill, with its attachments, is voluminous, and it would be

---

34. N.T.P.T.H., 2/4/15, p. 120.
35. *Id.* at p. 133.
36. "First Amended Petition To Compel Accounting...", ¶¶ 9-11.
37. N.T.P.T.H., 2/4/15, p. 197.
38. *See* Commonwealth's Exhibit 6, Adjudication of Judge Johnson, p. 2.

impossible in this Opinion to detail all of her findings. However, it was her expert opinion that $351,677.27 was "removed from Mr. Stiles' accounts by Scott Bartholomew without direct benefit to Wilbur Stiles."[39] For example, one of the encumbrances[40] on Mr. Stiles' home was for $150,000.00, and was used for items including a Harley Davison Motorcycle, 2000 Jeep Wrangler, trailer and trailer graphics. An additional $52,000.00 was deposited into the defendant's Wachovia account.[41] None of the purchased items would seem to fit Mr. Stiles' lifestyle. On 583 occasions the defendant "wrote checks, initiated debit transactions or conducted ATM withdrawals against Wilbur Stiles Wachovia (Wells Fargo) account" in the amount of $163,321.65.[42] It would appear that from February 2006 until June 2012, $326,529.58 was deposited into Mr. Stiles' account. The balance of Mr. Stiles' account in June, 2012 was zero. The defendant also issued checks to himself or made purchases for his benefit from the Wachovia (Wells Fargo) credit line in the sum of $118,970.47.[43] He also used $46,814.90 in funds from "the Wachovia (Wells Fargo) term loan to recover his tractor-trailer truck after it was re-possessed. All payments for this term loan were made from Wilbur Stiles bank account."[44] In that regard, Wilbur Stiles' saving bonds in the amount of $43,854.52 were redeemed and deposited into his account. Those funds were then used to cover the truck loan payments and the defendant's monthly spending. Fraud Examiner Mill only found $8,429.75 deposited into Mr. Stiles' account

39. Case Report, pp. 1, 8.
40. Wachovia Prime Equity Line.
41. Case Report, p. 6.
42. *Id.* at p. 8. *See also* Exhibits B, C1, C2 and C3 attached to Case Report.
43. *Id.*
44. *Id.* at p. 9.

by the defendant.[45] Finally, it appears that Mr. Stiles' annuity account with the Hartford was closed at the end of 2008. Although the funds were deposited in his checking account, over the next three (3) weeks, transactions in Maine, New Hampshire, Massachusetts, and Connecticut depleted that account without benefiting Mr. Stiles.

The defendant, during his interview with Detective Castellani, indicated that he began using the Power of Attorney in 2008, when his uncle was having difficulty writing out his checks. He admitted to Detective Castellani that "he did not comply with the Power of Attorney agreement that he signed regarding exercising said powers for the benefit [of the] principal, exercising reasonable caution and prudence, and keeping full and accurate records of all actions, receipts, and disbursements on behalf of the principal."[46] His "excuse was that he did not read the Power of Attorney documents. [He] was unemployed and not collecting any money. All bills and necessities were funded by the victim."[47]

The testimony of Mr. Stiles confirmed many of the findings of the certified fraud examiner. He testified that transactions made by the defendant from his accounts at Barnhouse Village, Dover International Speedway, Game Stop, Pocono Music Exchange, and many others were not authorized.[48] He was somewhat befuddled about the status of his home, but believed it was "seized" due to debts incurred by the defendant.[49] His savings bonds were also taken by the defendant from his safe deposit box in the

45. *Id.*
46. N.T.P.T.H., 2/4/15, p. 55.
47. *Id.* at pp. 55-56.
48. Preservation of Wilbur Stiles' testimony (hereinafter N.T.WS), pp. 27-30, 50, 59.
49. *Id.* at pp. 57-58, 63.

bank, and cashed in without his knowledge or permission.[50]

The "General Durable Power Of Attorney," which is dated October 21, 2003, not only was purportedly signed by Mr. Stiles, but also has an "Acknowledgment" signed by the defendant. This "Acknowledgment" required the defendant, as power of attorney for Mr. Stiles, to do the following: (1) "...[E]xercise the powers for the benefit of the principal"; (2) "...[K]eep the assets of the principal separate from my assets"; (3) "...[E]xercise reasonable caution and prudence"; (4) "...[K]eep a full and accurate record of all actions, receipts and disbursements on behalf of the principal." A review of the evidence permits the conclusion that the defendant failed to perform his fiduciary responsibilities. *See Chaput v. Cianci*, 2015 WL 1827496 * 3 (D. Virgin Islands)("[A] durable power of attorney created a fiduciary relationship, which included the duty of loyalty) (collecting cases); *Pennewill v. Harris*, 2011 WL 691618 (Del. Ch.) * 3 ("An attorney-in-fact serves as a fiduciary for his principal. An attorney-in-fact who uses the power given to him by the principal to transfer assets to himself has committed improper self-dealing, absent the voluntary and knowing consent of the principal").

Here, the defendant is charged with various theft related offenses, not a breach of a fiduciary duty. However, a power-of-attorney, neither explicitly nor implicitly, authorizes the "power holder" to steal from his grantor." *Boyce v. Fernandes*, 77 F.3d 946, 950 (7th Cir. 1996) (collecting cases); *see also State v. Knopp*, 2014 WL 645230 (Wash. App. Div. 1); *State v. Thompson*, 223 P.3d 1165 (2009); *State v. Georgeoff*, 2002 WL 58003 (Ohio app. 9 Dist.). Furthermore, a theft can occur even though

---

50. *Id.* at pp. 69-71.

initial control of the property was authorized. *People v. Stell*, 320 P.3d 382, 385 (2014)(Power of attorney did not preclude prosecution for theft). In *State v. Kennedy*, 296 A.2d 65, 66-67 (1972) it was explained that a power of attorney does not operate as a shield from prosecution. Instead, it was explained that "a 'power of attorney is not an instrument of gift but authorization [] to act for principal... [T]he instrument did not authorize the agent to make off with the principal's money. In short, the instrument was the means whereby the agent was able to get his hands on the money, but when the moneys were thus obtained, the agent received them as agent for the principal, and the fraudulent appropriation of the money thus obtained to his own use constituted embezzlement. In other words, it is no defense to embezzlement that the money reached the agent with the consent of the principal. On the contrary, such entrusting is the necessary setting for the crime...But it is no defense to embezzlement that the victim trusted the culprit." *Id.* at 67.

The defendant is charged with Theft by Unlawful Taking or Disposition,[51] Theft by Deception,[52] Theft by Failure to Make Required Disposition of Funds Received,[53] Receiving Stolen Property,[54] and Dealing in Proceeds of Unlawful Activities.[55] It is unnecessary to review the elements of each theft offense because a defendant accused of one type of theft under one section of the Crimes Code may be convicted with evidence demonstrating a different type of theft under the Crimes Code. *Commonwealth v. Robichow*, 487 A.2d 1000, 1003

---

51. 18 Pa.C.S. § 3921(a).
52. 18 Pa.C.S. § 3922(a)(1).
53. 18 Pa.C.S. § 3927(a).
54. 18 Pa.C.S. § 3925(a).
55. 18 Pa.C.S. § 5111(a)(1).

(Pa. Super. 1985); *Meriano v. Commissioner of Internal Revenue Service*, 142 F.3d 651, 659 (3rd Cir. 1998). In that regard, the Crimes Code provides the following:

§ 3902. Consolidation of theft offenses

Conduct denominated theft in this chapter constitutes a single offense. An accusation of theft may be supported by evidence that it was committed in any manner that would be theft under this chapter, notwithstanding the specification of a different manner in the complaint or indictment, subject only to the power of the court to ensure fair trial by granting a continuance or other appropriate relief where the conduct of the defense would be prejudiced by lack of fair notice or by surprise.

18 Pa.C.S. § 3902.

It is the "thieving state of mind" which is "the essence of the theft charge, and the purpose of section 3902 is to reduce the opportunity for technical defenses based upon legal distinctions between thefts of various kinds." *Commonwealth v. Robinchow*, 487 A.2d at 1004. "Thus, the proof of theft, per se, is sufficient to establish the commission of the crime, whether it was titled theft by deception or theft by failure to make required disposition, the manner of taking simply being the specific details of the theft and not constituting different elements of the crime." *Id.*

In that vein, Section 3927 provides in pertinent part:

(a) Offense defined — A person who obtains property upon agreement, or subject to a known legal obligation, to make specified payments or other disposition, whether from such property or its proceeds or from his own property to be reserved in equivalent amount, is guilty of theft if he intentionally deals with the property obtained

as his own and fails to make the required payment or disposition. The foregoing applies notwithstanding that it may be impossible to identify particular property as belonging to the victim at the time of the failure of the actor to make the required payment or disposition.

18 Pa.C.S. § 3927(a)

The four elements to complete this crime are the following:

1. The obtaining of property of another;

2. Subject to an agreement or known legal obligation upon the recip[ient] to make specified payments or other disposition thereof;

3. Intentional dealing with the property obtained as the defendant's own; and

4. Failure of the defendant to make the required disposition of the property.

*Commonwealth v. Turrell*, 584 A.2d 882, 884 (Pa. 1990); *Commonwealth v. Morrissey*, 654 A.2d 1049, 1052 (Pa. 1995) (*quoting Turrell*); *Robichow*, 487 A.2d at 1002; *Commonwealth v. Fritz*, 470 A.2d 1364, 1366 (Pa. Super. 1983).

Here, the defendant obtained the property of Wilbur Stiles. He used the power of attorney to gain access to Mr. Stiles' bank accounts and other assets. His possession of those substantial assets did not change their ownership. The bank accounts, savings bonds, annuity accounts, residence and other assets were the "property of another," namely, Wilbur Stiles. Section 3901 defines "property of another" in pertinent part as "property in which any person other than the actor has an interest which the actor is not privileged to infringe, regardless of the fact that the

actor also has an interest in the property..." 18 Pa.C.S. § 3901. Furthermore, "a victim need not maintain absolute title over property to claim theft by wrongful disposition of funds received." *Meriano v. Commissioner of Internal Revenue Service*, 142 F.3d at 660.

The defendant obtained the property of Wilbur Stiles subject to an agreement or known legal obligation to make specified payments or otherwise dispose of the property. The power of attorney required him to act as a fiduciary for the principal, not to use his funds as a private piggy-bank. It is also readily apparent that the defendant was intentionally dealing with Mr. Stiles' property as his own. The magnitude of the liquidation of Mr. Stiles' assets supports that conclusion. For example, the records reflect hundreds of ATM withdrawals, and checks written and cashed by the defendant. Mr. Stiles denied the possession or use of an ATM card. The certified fraud examiner reached the opinion that transactions from Mr. Stiles' bank account that were connected to the defendant totaled $163,321.65. Likewise, the Wachovia Prime Equity Credit Line, which was secured with Mr. Stiles' residence, reflects purchases including a Harley Davidson motorcycle, a Jeep Wrangler, and a trailer for a truck purchased for $30,863. It may later be demonstrated that Mr. Stiles was a Harley enthusiast who followed the motto "live to ride, ride to live," but on the surface, it is more likely that the defendant purchased the motorcycle for his own benefit. The certified fraud examiner's report and its supporting details not only confirms the aforementioned use of Mr. Stiles' accounts by the defendant for his own benefit, but provides numerous other examples of the defendant's self-dealing.

Finally, the evidence presented at the hearings demonstrates that the defendant failed to make the required disposition of the hundreds of thousands of dollars in Mr.

Stiles' accounts. During the period of January 28, 2006 to June 25, 2012, the certified fraud examiner found that $326,529.88 of Mr. Stiles' funds was deposited into his account. The numerous debit transactions over the same period of time totaled $355,377.38. The defendant's personal use of Mr. Stiles' assets for himself and his family is explained in the certified fraud examiner's report. To make matters worse, while the defendant was using Mr. Stiles' substantial assets, and although assets were available, he failed to even pay for Mr. Stiles' care at Cedarbrook Nursing Home and Gino Merli Veterans Home.[56] The disposition of funds benefited the defendant, not Wilbur Stiles.

---

56. The defendant is also charged with Dealing in Proceeds of Unlawful Activities. 18 Pa.C.S. § 5111(a)(1)(2). This section in pertinent part requires the Commonwealth to prove the following:
(a) Offense defined. — A person commits a felony of the first degree if the person conducts a financial transaction under any of the following circumstances:
(1) With knowledge that the property involved, including stolen or illegally obtained property, represents the proceeds of unlawful activity, the person acts with the intent to promote the carrying on of the unlawful activity.
(2) With knowledge that the property involved, including stolen or illegally obtained property, represents the proceeds of unlawful activity and that the transaction is designed in whole or in part to conceal or disguise the nature, location, source, ownership or control of the proceeds of unlawful activity.
A "financial transaction" is defined as "[a] transaction involving the movement of funds by wire or other means or involving one or more monetary instruments." 18 Pa.C.S. § 5111(f) A claim that the defendant did not engage in financial transactions with Mr. Stiles' assets would be frivolous, and any further discussion is unnecessary.
"Unlawful activity" is defined as "[a]ny activity graded a misdemeanor of the first degree or higher under Federal or State law." The defendant is charged with felony theft offenses, which has been interpreted as "unlawful activity." *Commonwealth v. Barnhart*, 722 A.2d 1093, 1096 (Pa. Super. 1998). The defendant's actions, as explained earlier in this opinion, support the conclusion that the defendant knowingly and wrongfully used Mr. Stiles' assets with the intent of promoting the "unlawful activity," and the financial transactions in part were designed to "conceal or disguise the nature...source, ownership or control of the proceeds of unlawful activity."

The Commonwealth's evidence establishes a *prima facie* case as to each of the charges.

### III. Statute of Limitations

The defendant contends that the applicable statute of limitations expired prior to the commencement of the criminal charges in this case. This assertion is advanced even though the defendant surreptitiously used Mr. Stiles' funds for many years, and law enforcement did not learn of his conduct until 2012. Specifically, Lieutenant Sorrentino did not learn of the defendant's conduct until he interviewed him on December 10, 2012. He filed charges on August 8, 2013.

A prosecution for certain "major offenses" must be commenced within five years after it is committed. 42 Pa.C.S. § 5552(b). All of the offenses commenced against the defendant fall within this subsection. It is the termination of the conduct that triggers the running of the statute of limitations. *Commonwealth v. Stitt*, 947 A.2d 195, 197 (Pa. Super. 2008). "An offense is committed either when every element occurs, or if a legislative purpose to prohibit a continuing course of conduct plainly appears, at the time when the course of conduct plainly appears, at the time when the course of conduct or the complicity of the defendant therein is terminated. Time starts to run on the day after the offense is committed." 42 Pa.C.S. § 5522(d).

The offenses committed by the defendant continued until the power of attorney was revoked on or about February 12, 2012. Even after the power of attorney was

revoked, the defendant continued to cash checks claiming the power of attorney as authorization for his actions. The records reflect that the defendant cashed his last check from Wilbur Stiles' bank account on February 27, 2012. The prosecution commenced on August 8, 2013, which is well within the five (5) year statute of limitations, regardless of which date in 2012 the defendant's criminal conduct ended.

The defendant's argument also fails because even if the statute of limitations expired "a prosecution may nevertheless be commenced for: (1) Any offense a material element of which is either fraud or a breach of fiduciary obligations within one year after discovery of the offense by an aggrieved party or by a person who has a legal duty to represent an aggrieved party and who is himself not a party to the offense, but in no case shall this paragraph extend the period of limitations otherwise applicable by more than three years." 42 Pa.C.S. § 5552(c)(1).

It is well-settled that the statute of limitations does not begin to run until the breach of the defendant's fiduciary obligation was discovered. *Commonwealth v. Fisher*, 682 A.2d 811, 818 (Pa. Super. 1996); *see also Commonwealth v. Volk*, 444 A.2d 1182, 1187 (Pa. Super. 1982)(Fraud is a material element of the offense of theft by deception). Lieutenant Sorrentino's interview with the defendant did not trigger the discovery of the defendant's offenses because "discovery is not satisfied by mere suspicion; it requires acquisition of knowledge that a penal statute has been violated. *Commonwealth v. McSloy*, 751 A.2d 666 (Pa. Super. 2000) *citing*

*Commonwealth v. Hawkins*, 439 A.2d 748, 750 (Pa. Super. 1982). This means that Lieutenant Sorrentino's filing of the complaint on August 8, 2013, under this exception, if necessary, was timely. Furthermore, the date of his interview with the defendant did not constitute discovery because discovery did not occur until his investigation determined crimes were committed by the defendant.

In short, the prosecution of the defendant is not time-barred.[57]

## ORDER

AND NOW, this 19th day of June, 2015, following hearings held in this matter and after consideration of the defendant's Motion To Suppress Statements, Motion To Dismiss (Habeas Corpus), and Motion To Dismiss (Statute of Limitations) contained in the "Omnibus Pre-Trial Motion For Relief";

IT IS HEREBY ORDERED that said motions are DENIED.

---

57. The defendant's arguments also fail because even if some evidence related to the charges could be barred by the statute of limitations, that same evidence would be admissible to prove the defendant's chain of events and course of criminal conduct committed by the defendant. *Commonwealth v. Kincaid*, 95 A.3d 279, 285 (Pa. Super. 2014); *Commonwealth v. Weiss*, 81 A.3d 767, 715-716 (Pa. 2013) *quoting Commonwealth v. Lark*, 543 A.2d 491, 497 (Pa. 1988) ("Evidence of other crimes may be relevant and admissible [] where such evidence was part of the chain or sequence of events which became part of the history of the cases and found part of the natural development of the facts."). *See also U.S. v. Pharis*, 298 F.3d 228, 234 (3rd Cir. 2002)(Mailings that fall outside the statute of limitations can be considered as evidence to prove later fraud that was within the statute of limitations.).