J-A06012-20

2020 PA Super 116

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellant | |
| v. | |
| BRANDON W.W. BOSTIAN | |
| Appellee | No. 2212 EDA 2019 |

Appeal from the Order Entered July 23, 2019
In the Court of Common Pleas of Philadelphia County
Criminal Division at No.: CP-51-CR-0001039-2018

BEFORE: STABILE, KING, JJ., and STEVENS, P.J.E.*

OPINION BY STABILE, J.:                              Filed: May 14, 2020

On May 12, 2015, Amtrak Train 188 ("Train 188") derailed at the Frankford Curve in Philadelphia, resulting in the deaths of eight passengers and serious injuries to numerous others.[1]  The Commonwealth's Office of the Attorney General ("OAG")[2] charged the Appellee, Brandon W.W. Bostian, with

---

* Former Justice specially assigned to the Superior Court.

[1] The parties stipulated that Laura Finamore, age 47, Abid Gilani, age 55, Derrick Eugene Griffith, age 45, Rachel Jacobs, age 39, Justin Brandon Zemser, age 20, Giuseppe Piras, age 39, Marshall Gaines III, age 48, and Robert Guidersleeve, Jr., age 45, lost their lives in the derailment.  They died due to either blunt force trauma or asphyxiation.  N.T. Preliminary Hearing, 9/12/17, at 21-29.

[2] The OAG became involved in this case after the Philadelphia District Attorney's Office ("DA") recused itself.  The DA decided that it was not going to level any charges against Appellee because of insufficiency of evidence to establish criminal culpability.  Following the filing of a private criminal complaint, the Philadelphia Municipal Court directed the DA to charge Appellee with involuntary manslaughter and recklessly endangering another person ("REAP").  To avoid a conflict of interest, the DA referred this case to the OAG.

causing catastrophe, eight counts of involuntary manslaughter, and 246 counts of REAP.[3]  Upon Appellee's motion for reconsideration, the Court of Common Pleas of Philadelphia County ("trial court"), by order entered July 23, 2019, dismissed all charges against Appellee based upon its conclusion that the Commonwealth failed to meet its burden of establishing a *prima facie* case on all charges.  The Commonwealth now appeals.  Upon review, we reverse and remand.

On September 12, 2017, Judge Thomas F. Gehret of the Philadelphia Municipal Court conducted a preliminary hearing, at which the Commonwealth offered the testimony of several witnesses.  The Commonwealth first called to the stand Officer Michael Maresca of the Philadelphia Police Department.  N.T. Preliminary Hearing, 9/12/17, at 30.  Officer Maresca testified that, on the evening of May 12, 2015, he and his partner were assigned to the crime scene unit working a homicide case in the area of Frankford when he heard a loud sound that he described as "metallic—like a car crash, like a car crash, but a lot louder, a lot louder." *Id.* at 30-32.  He testified that they then received a city-wide radio dispatch and responded to a major incident in the area of Frankford and Wheatsheaf Lane. *Id.* at 31, 37.

> Recalling his observation of the incident, Officer Maresca testified:
>
> When I got [to Wheatsheaf Lane and Frankford Avenue] there was no lighting.  Officers were running towards the railroad.  That's where we proceeded.  When I got to the railroad, I had my camera

---

[3] 18 Pa.C.S.A. §§ 3302(a), 2504(a), and 2705, respectively.

with me. I observed eight, maybe nine Amtrak cars as if they were tossed around, just like a kid's toys. The engine, which was facing northbound, was to the far right. The one behind that would be the first car which looked like a tin can that had been kicked and stomped on, it was just rolled up [], and every car behind that was just going off to the side there.

*Id.* at 32-33. The area lacked lighting because the derailed train downed the power lines. *Id.* at 35, 38. Since the power lines were arcing and popping, emergency responders were forced to wait until the power was cut off. *Id.* at 36. Prior to arriving at the scene, Officer Maresca did not know how many people were on the train. *Id.* at 37. He further testified that he discovered several deceased and multiple injured individuals. *Id.* at 33-34. In addition, he also found dismembered and severed body parts, specifically limbs. *Id.* at 33-34, 40.

Next to testify for the Commonwealth was Blair Berman, a frequent Amtrak passenger who was traveling back to New York from Philadelphia on Train 188. *Id.* at 66-70. Ms. Berman testified that she was on the train for "about ten minutes." *Id.* at 69. She recalled that she was in the first car of the train, which is business class. *Id.* She testified that even though she was in the first car, she did not have a business class ticket. *Id.* She recalled entering the first car through coach as it was "normally empty" at night. *Id.* at 70. She recalled:

I take the train all the time so at first it felt normal. . . . I noticed approaching the curve that the train started to ***speed up*** but nothing like clicked with me yet. Then like as we approached the turn, I just heard screaming from the front of my car and then just like a big bang and I blacked out, and I woke up in the woods, not on the train.

- 3 -

*Id.* at 69 (emphasis added). According to Ms. Berman, as the train was approaching the curve, she noticed that her body "was shifting to the right and [the train was] tilting and just going way too fast and not slowing down[.]" *Id.* at 70-71. She testified that the train was going "very fast." *Id.* at 71. Ms. Berman recalled that when she regained consciousness, she observed:

> I was laying on the woods [*sic*] and I had three other people on top of my left leg. So I like slid myself so I could get them off my leg and I tried standing up and I collapsed. So I held onto a tree branch and I was standing like a flamingo on my good leg, my left leg, and my left arm was holding onto the tree branch and I was just screaming for help. Like I lost all my belongings, my phone, my suitcase, my flip flops weren't on my feet when I woke up. I had blood everywhere and I was just screaming for help. It was pitch black and no one was around besides the other injured people.

*Id.* at 71-72. Her right arm was broken and she sustained other injuries. *Id.* at 72. At some point, she encountered Appellee in the field, whom she did not know at the time. *Id.* at 73, 76. She testified that Appellee had blood on his face, but otherwise did not appear to be injured. *Id.* at 88. According to Ms. Berman, Appellee was wearing a black T-shirt and jeans. *Id.* at 74. She testified that Appellee did not wear anything that would have revealed his employment with Amtrak. *Id.* He also did not identify himself to her as an Amtrak employee or the engineer of Train 188. *Id.* at 74, 89. She recalled asking Appellee to use his cell phone. *Id.* at 73-74. Appellee refused permission. *Id.* at 74. She testified that she "asked him again and again until he told me I could use his phone." *Id.* Ms. Berman called her father. *Id.* at 75. During the call, Ms. Berman asked Appellee whether he knew where they were or the train number. *Id.* at 76. According to Ms. Berman's testimony,

Appellee responded in the affirmative, stating that they "were at Frankford Junction and Amtrak [Train] 188." *Id.*

Officer Eric McClendon of the Philadelphia Police Department was then called to testify for the Commonwealth. *Id.* at 91. Officer McClendon testified that he was assigned to the Bomb Disposal Unit on the night of May 12, 2015. He recalled that

> [he] and Officer Edward McConnnell [] responded to an incident of a train derailment, and upon entering that location we were met by my sergeant who's another bomb technician, Michael Bloom[.] It was reported to him and relayed to myself and Officer McConnell that there was a suspicious bag located on the locomotive section of the train that was derailed.

*Id.* at 92. According to Officer McClendon, their check of the incident site did not reveal any explosive devices. *Id.* at 94. Officer McClendon testified that they did, however, locate a green bookbag in the engineer's section of the locomotive. *Id.* 94, 97. He discovered "numerous files, numerous papers, charts, maps, a small tablet in the front, and the engineer's identification card" in the bag. *Id.* at 97. Appellee's name was on the identification card. *Id.*

Special Agent Brian Julian of the Federal Bureau of Investigation testified next. He was assigned to investigate the May 12, 2015 derailment. *Id.* at 105-06. He testified that the National Transportation Safety Board ("NTSB") took possession of the green bookbag. *Id.* at 109. The small tablet computer was not included on the NTSB list of contents, and could not be located at any point thereafter. *Id.* at 109-10. Thus, according to Special Agent Julian, the only electronic device submitted for analysis was the cell

phone that was in Appellee's possession at the time of the incident. ***Id.*** at 109.

The Commonwealth called to the stand Detective Joseph Knoll, Northwest Detectives, Special Investigation Unit. ***Id.*** at 114. He testified that he was involved in investigating the derailment of Train 188. ***Id.*** Detective Knoll testified that he was dispatched to Einstein Hospital to interview and identify survivors. ***Id.*** at 114-15. While at the hospital, he observed Appellee enter the triage area and overheard him asking "a group of people by the nurses and doctors, are we in New York?" ***Id.*** at 116. Appellee eventually identified himself to Detective Knoll as the engineer of Train 188. ***Id.*** at 115. Detective Knoll testified that when he asked Appellee whether he recalled what had happened, Appellee replied, "I don't remember, the last thing I remember [i]s the North Philadelphia train station." ***Id.*** at 115-16.

Detective Joseph Degrazia, Amtrak Police Department, next testified that he was involved in the investigation of the derailment of Train 188 on May 12, 2015. ***Id.*** at 120. Detective Degrazia stated that he was assigned to assist "the FBI and the City of Philadelphia with obtaining various forms of information relating to Amtrak information." ***Id.*** at 120. He testified that his review of Amtrak records, specifically the passenger manifest, indicated that 251 people, including Appellee, were on Train 188 at the time of the incident. ***Id.*** at 121-22. Of these people, five were Amtrak crew members and three were deadheads, Amtrak employees who were "in the middle of service going from one location to another without having to pay a fa[re]." ***Id.*** at 122.

Detective Degrazia acknowledged that, as part of Appellee's responsibilities to operate a passenger train on the Philadelphia to New York route, Appellee "was required to know the speed limit of every section on that route." *Id.* at 123. Detective Degrazia testified that, during the six weeks prior to the May 12, 2015 incident, Appellee went through the Frankford Curve 25 times at an average speed of 49 mph. *Id.* at 233-34.

Lastly, the Commonwealth presented the testimony of Jonathan Hines, Amtrak's Senior Director of Compliance and Certification. *Id.* at 125. Mr. Hines testified that he has been working for Amtrak for twenty-one years and oversees, in part, the certification of engineers and conductors. *Id.* According to Mr. Hines, at the time of the derailment, he worked as a System General Road Foreman ("Foreman"), overseeing engineer training and certification. *Id.* at 125-26. He testified that, as a Foreman, he had access to the training qualifications of all Amtrak engineers, including Appellee, who worked the Philadelphia to New York route. *Id.* at 126-128. Mr. Hines remarked that, as a Foreman, he oversaw roughly 1600 people. *Id.* at 126.

Mr. Hines testified that, before joining Amtrak, Appellee was a railroad engineer for Caltrans in the San Francisco Bay Area. *Id.* at 129. According to Mr. Hines, upon joining Amtrak, Appellee successfully completed an eight-week program of classroom and on-the-job training ("OJT") for the Northeast rail corridor under the supervision of an instructor engineer. *Id.* at 128-131. The program included time in a simulator. *Id.* at 128. Mr. Hines explained that OJT involved "[q]ualifications of physical characteristics and proficiency

of operation over those routes that you're required to be qualified on." *Id.* at 130. Mr. Hines defined physical characteristics as "[t]he railroad itself, learning and understanding and memorizing the actual railroad and the operation of that railroad. So signals, speeds, stations, rules [in] effect for that particular route." *Id.*

Mr. Hines testified that Appellee had to "memorize his route" before he could operate a train satisfactorily. *Id.* Specifically, Mr. Hines explained that Appellee was required to know the permissible speed and the physical characteristics for each portion of the route. *Id.* Mr. Hines indicated that Appellee's memorization or knowledge of the physical characteristics of each portion of the route would have informed him of his location on the route at all times. *Id.* at 131. As part of the physical characteristics of the route, Appellee was also required to memorize the location of interlockings and stations. *Id.* at 139-40. "Interlockings is a location where you have signals and switches that are controlled by dispatch that allow a train to travel from one track to another." *Id.* at 139.

Mr. Hines testified that, for purposes of qualifying as an engineer on the Northeast route, Appellee eventually passed a written test demonstrating that he knew "the physical characteristics, the signals, the speeds, [and] the curves" the train would encounter. *Id.* at 136. He stated that Appellee was promoted and assigned to the Northeast corridor given his previous experience in the Bay Area. *Id.* As a result, once Appellee demonstrated proficiency and expertise of the physical characteristics and speed limits of

the route, he was permitted to operate a train as a sole engineer. *Id.* at 138. Mr. Hines testified that Appellee was the sole engineer on May 12, 2015, the night of the derailment of Train 188. *Id.*

Mr. Hines explained that Train 188 featured an onboard event recorder that "shows speed, it shows your cab signal aspect, throttle positions, your brake position, it shows the alerter, it shows the horn, bell, it shows distance, time of day, [and] date." *Id.* at 143. Mr. Hines further explained that an alerter is a device that periodically, or as often as every twenty seconds at higher speeds, prompts an engineer to reset it. *Id.* at 143-44, 151. "That's the alertness system that[] during operation goes off if the engineer is not active doing something with the controls, such as moving a throttle, brake, blowing the horn or bell." *Id.* at 143. Mr. Hines stated that when the alerter goes off, "the engineer has to either acknowledge or move the throttle, brake, or blow the horn or push the blow button and that will reset the alerter." *Id.* at 144. If the engineer does not respond, the brakes of the train will come on and the train will stop. *Id.*

According to the data retrieved from the event recorder, upon leaving the 30th Street Station in Philadelphia, Appellee complied with posted speeds through the Mantua Section, past the overhead Ridge Avenue bridge, and through the Diamond Street bridge, Lehigh Interlocking, North Philadelphia Station, and Clearfield interlocking areas, traveling west to east. *Id.* at 146- 162. Appellee then negotiated the Clearfield curve—mile marker 84—at 65 mph, which is the speed limit for the curve. *Id.* at 164. Thereafter, Appellee

increased the speed of Train 188, but remained under the subsequent speed limit of 80 mph. *Id.*

Mr. Hines testified that upon clearing the Clearfield curve, Appellee approached the Shore Interlocking area—at mile marker 82.1—where the speed of Train 188 rose above 80 mph. *Id.* at 165-67. Mr. Hines indicated that Appellee had moved the throttle "all the way into full power." *Id.* at 168-69. He explained that Appellee continued to accelerate Train 188's speed as it reached Frankford Junction at mile marker 81.8, where the track sharply curves to the left and the speed limit is 50 mph. *Id.* at 171-75. Mr. Hines described the Frankford Curve as a difficult S-shaped curve. *Id.* at 177. He testified that Appellee's speed was 106 mph. *Id.* at 175-76. As Train 188 entered the Frankford Curve, Appellee applied the brakes, managing only to reduce the speed to 104 mph. *Id.* at 176. That was the last recorded speed prior to the derailment. *Id.* Mr. Hines summarized that Appellee accelerated Train 188 from mile marker 84, Clearfield Curve, where the speed limit is 65 mph, to mile marker 81, Frankfurt Curve, where the speed limit is 50 mph, from 65 mph to 106 mph before reducing the speed to 104 mph. *Id.* at 182-83. Mr. Hines testified that Appellee physically moved the throttle forward to accelerate Train 188 until he applied the brakes prior to entering the Frankford Curve. *Id.* at 184. He also testified that Train 188 and the rails were in proper working order, *i.e.*, without defect, prior to the derailment. *Id.* at 184-85.

On cross-examination, over the Commonwealth's objection, Appellee's counsel asked Mr. Hines to opine about "situational awareness." *Id.* at 185-

- 10 -

87. Mr. Hines explained, over the Commonwealth's objection, that the term is widely used in the railroad industry as meaning "to lose sight of your situation." *Id.* at 187. Again, over the Commonwealth's objection, Mr. Hines acknowledged that sometimes train operators may lose situational awareness. *Id.* at 188. Appellee's counsel then, over the Commonwealth's objection, asked Mr. Hines whether he was aware of an emergency situation involving a Southeastern Pennsylvania Transportation Authority ("SEPTA") train that occurred after Train 188 departed 30th Station in Philadelphia but prior to the derailment. *Id.* at 192. Over the Commonwealth's objections, Mr. Hines answered that "[t]here was a SEPTA train stopped on one track just east or— east of Mantua or west of Lehigh [near the Diamond Street bridge]" because it was reportedly "struck by either stones or rocks." *Id.* at 192-95. Over the Commonwealth's objection, Mr. Hines conceded that the SEPTA train operator's radio broadcast regarding the reported throwing of stones or rocks could have been heard by Appellee in Train 188. *Id.* at 197. Mr. Hines acknowledged that Appellee was not under the influence of any intoxicants or drugs at the time of the derailment of Train 188. *Id.* at 209.

On re-direct, Mr. Hines testified that engineers are trained to confront situations where projectiles are thrown at a train. *Id.* at 223. In this regard, he testified engineers are "provided safety glasses, it's talked about to protect your eyes should something strike the windshield, one of the reasons why we wear the safety glasses." *Id.* at 224. He further testified that one of Amtrak's rules for engineers is that they "control the speed of [their] train" when they

encounter a situation involving a projectile. *Id.* at 226. Mr. Hines recalled that, after Appellee passed the disabled SEPTA train, he complied with all speed restrictions on the tracks until he accelerated after the Clearfield Curve. *Id.* at 228. The derailment of Train 188 occurred five miles from the disabled SEPTA train. *Id.* at 227.

After the close of testimony, and following argument, Judge Gehret concluded that the Commonwealth failed to establish a *prima facie* case and dismissed the charges against Appellee. *Id.* at 246. The court reasoned:

> From your evidence [Appellee] had traveled this route 25 times, never had a problem. He had followed the proper speeds on all the mile markers on the route as per your witness. He is experienced as per your evidence. He is an expert at driving this train. Now, my standard here is more likely than not. Based on that evidence, [the court] feel[s] it's more likely than not this is an accident and not negligence that would amount to criminal negligence, so for that reason this case is discharged for lack of evidence on all charges.

*Id.*

The Commonwealth timely appealed the dismissal of charges against Appellee to the trial court. In its memorandum of law in support of appeal, the Commonwealth argued that the municipal court erred because, when viewing the evidence in a light most favorable to the Commonwealth, the evidence of record supported a *prima facie* case against Appellee. *See* Memorandum in Support of Appeal, 11/20/17, at 12 (unpaginated). On December 5, 2017, Appellee filed a writ of *habeas corpus*, seeking to dismiss all charges based on the Commonwealth's alleged failure to establish a *prima facie* case for the *mens rea* requirement of recklessness or gross negligence.

- 12 -

On the same day, Appellee also filed a motion to quash, alleging that the Commonwealth's appeal to the trial court was interlocutory and therefore, improper. The Commonwealth filed a response. The trial court denied the motion to quash on December 27, 2017. On February 6, 2018, without a written decision, the Honorable Kathryn S. Lewis reversed the municipal court's dismissal and held all charges against Appellee for court.

More than a year later, at some point in January 2019, the Honorable Barbara A. McDermott was assigned to this case, replacing Judge Lewis. On July 9, 2019, Appellee filed a motion for reconsideration of Judge Lewis' decision to hold the charges for court. Appellee asserted that the Commonwealth failed "to establish a *prima facie* case with respect to any of the charges." Reconsideration Motion, 7/9/19, at ¶ 6. Following a hearing, Judge McDermott granted the reconsideration motion and dismissed all charges against Appellee, concluding that the Commonwealth failed to establish *prima facie* evidence for the *mens rea* requirement of recklessness. The Commonwealth timely appealed.[4] Both the Commonwealth and the trial court complied with Pa.R.A.P. 1925.

On appeal, the Commonwealth presents two issues for our review:

[I.] Did the lower court violate the coordinate jurisdiction rule by reviewing the sufficiency of the evidence for a *prima facie* case where a judge of the same court had previously ruled that the evidence was sufficient?

---

[4] An order dismissing criminal charges prior to trial is appealable by the Commonwealth. ***Commonwealth v. McBride***, 595 A.2d 589, 590 n.3 (Pa. 1991) (citation omitted).

- 13 -

[II.] To the extent the question may be reached, did the lower court err in holding that the evidence was insufficient for a *prima facie* case?

Commonwealth Brief at 3.

We first address the Commonwealth's argument that Judge McDermott erred when she overruled a prior decision by Judge Lewis regarding the sufficiency of evidence for a *prima facie* case to support the charges against Appellee.

In **Zane v. Friends Hospital**, 836 A.2d 25 (Pa. 2003), our Supreme Court reiterated the law of the case doctrine. It is composed of three canons:

> (1) upon remand for further proceedings, a trial court may not alter the resolution of a legal question previously decided by the appellate court in the matter; (2) upon a second appeal, an appellate court may not alter the resolution of a legal question previously decided by the same appellate court; and (3) upon transfer of a matter between trial judges of **coordinate jurisdiction**, the transferee trial court may not alter the resolution of a legal question previously decided by the transferor trial court.

**Zane**, 836 A.2d at 29 (quoting **Commonwealth v. Starr**, 664 A.2d 1326, 1331 (Pa. 1995)) (emphasis added). The third rule, commonly referred to as the "coordinate jurisdiction rule," provides that judges of coordinate jurisdiction should not overrule each other's decisions. **Zane**, 836 A.2d at 39. The rule is "based on a policy of fostering the finality of pre-trial applications in an effort to maintain judicial economy and efficiency." **Starr**, 664 A.2d at 1331. Consistent with the law of the case doctrine generally, it "serves to protect the expectations of the parties, to ensure uniformity of decisions, to maintain consistency in proceedings, to effectuate the administration of justice, and to bring finality to the litigation." **Id**. The "prohibition against

revisiting the prior holding of a judge of coordinate jurisdiction, however, is not absolute." *Id*. We recognize that a departure from the rule is warranted in "exceptional circumstances" where there has been a change in controlling law, a substantial change in the facts or evidence, or where "the prior holding was *clearly erroneous* and would create a manifest injustice if followed." *Id*. (emphasis added). Our Supreme Court explained the clearly erroneous exception as follows.

> To accede to a coordinate judge's order that is clearly erroneous would be not only to permit an inequity to work on the party subject to the order, but would allow an action to proceed in the face of almost certain reversal on appellate review. Moreover, the requirement that the prior holding also create a manifest injustice serves as a significant curb on the exception so that it would apply to only those situations in which adhering to the prior holding would be, in essence, *plainly intolerable*.

*DiGregorio v. Keystone Health Plan E.*, 840 A.2d 361, 368–69 (Pa. Super. 2003) (*en banc*) (quoting *Zane*, *supra* at 29-30)) (emphasis added).

Instantly, it is beyond dispute that Judge McDermott relied on the "clearly erroneous" exception to the coordinate jurisdiction rule in overruling Judge Lewis. Thus, to determine whether Judge McDermott erred, we must analyze the substance of Appellee's motion for reconsideration, *i.e.*, whether the Commonwealth presented *prima facie* evidence for the *mens rea* requirement of recklessness or gross negligence inherent in all charges leveled against Appellee.

The purpose of a preliminary hearing is to determine whether the Commonwealth has made out a *prima facie* case for the offenses charged. *Commonwealth v. Jackson*, 894 A.2d 1254, 1257 (Pa. Super. 2004)

- 15 -

(citation omitted). "A *prima facie* case consists of evidence, read in the light most favorable to the Commonwealth, that sufficiently establishes both the commission of a crime and that the accused is probably the perpetrator of that crime." ***Commonwealth v. Black***, 108 A.3d 70, 77 (Pa. Super. 2015) (citation omitted). As we have explained previously:

> The Commonwealth establishes a *prima facie* case when it produces evidences that, ***if accepted as true***, would warrant the trial judge to allow the case to go to a jury. The Commonwealth need not prove the elements of the crime beyond a reasonable doubt; rather, the *prima facie* standard requires evidence of the existence of each and every element of the crime charged. Moreover, ***the weight and credibility of the evidence are not factors at this stage***, and the Commonwealth need only demonstrate sufficient probable cause to believe the person charged has committed the offense. Inferences reasonably drawn from the evidence of record which would support a verdict of guilty are to be given effect, and the evidence must be read in the light most favorable to the Commonwealth's case.

***Commonwealth v. Marti***, 779 A.2d 1177, 1180 (Pa. Super. 2011) (internal citations and quotations omitted) (emphasis added). Moreover, "suspicion and conjecture are not evidence and are unacceptable as such." ***Commonwealth v. Packard***, 767 A.2d 1068, 1071 (Pa. Super. 2001) (citations omitted). Proof beyond a reasonable doubt is not required. ***Black***, 108 A.3d at 70; ***see McBride***, 595 A.2d at 591 (noting that the *prima facie* hurdle is less demanding than the Commonwealth's burden at trial of proving guilt beyond a reasonable doubt).

"It is settled that the evidentiary sufficiency, or lack thereof, of the Commonwealth's *prima facie* case for a charged crime is a question of law as to which an appellate court's review is plenary." ***Commonwealth v.***

*Karetny*, 880 A.2d 505, 513-14 (Pa. 2005) (citations omitted). "[T]he trial court is afforded no discretion in ascertaining whether, as a matter of law and in light of the facts presented to it, the Commonwealth has carried its pre-trial *prima facie* burden to make out the elements of a charged crime." *Id.* at 513. Therefore, we are not bound by the legal determinations of the trial court. ***Commonwealth v. Dantzler***, 135 A.3d 1109, 1112 (Pa. Super. 2016).

Here, Appellee was charged with causing catastrophe, eight counts of involuntary manslaughter and 246 counts of REAP. Under Section 3302(a) of the Crimes Code, a person commits a second-degree felony if the person ***recklessly*** causes "a catastrophe by explosion, fire, flood, avalanche, collapse of building, release of poison gas, radioactive material or other harmful or destructive force or substance, or by any other means of causing potentially widespread injury or damage[.]" 18 Pa.C.S.A. § 3302(a). The "any other means of causing potentially widespread injury or damage" is open-ended and not exhaustive. ***Commonwealth v. Mikitiuk***, 213 A.3d 290, 301 (Pa. Super. 2019) (citing ***Karetny***, 880 A.2d at 517).

Under the Crimes Code, "[a] person is guilty of involuntary manslaughter when as a direct result of the doing of an unlawful act in a ***reckless*** or ***grossly negligent*** manner, or the doing of a lawful act in a reckless or grossly negligent manner, he causes the death of another person." 18 Pa.C.S.A. § 2504(a) (emphasis added). Stated differently, "involuntary manslaughter requires 1) a mental state of either recklessness or gross negligence, and 2) a causal nexus between the conduct of the accused and

- 17 -

the death of the victim." ***Commonwealth v. Fabian***, 60 A.3d 146, 151 (Pa. Super. 2013), ***appeal denied***, 69 A.3d 600 (Pa. 2013).

A person commits REAP under Section 2705 of the Crimes Code "if he ***recklessly*** engages in conduct which places or may place another person in danger of death or serious bodily injury." 18 Pa.C.S.A. § 2705 (emphasis added). Thus, to sustain a conviction for REAP, the Commonwealth must prove that the defendant "(1) possessed 'a *mens rea* [of] recklessness,' (2) committed a wrongful deed or guilty act ('*actus reus*'), and (3) created by such wrongful deed the danger of death or serious bodily injury to another person." ***Commonwealth v. Emler***, 903 A.2d 1273, 1278 (Pa. Super. 2006) (citation omitted). The reckless mental state required for a REAP conviction has been defined as "a conscious disregard of a known risk of death or great bodily harm to another person." ***Id.*** (citation omitted). REAP "requires the creation of danger, so the Commonwealth must prove the existence of an actual present ability to inflict harm to another." ***Commonwealth v. Shaw***, 203 A.3d 281, 284 (Pa. Super. 2019).

With the foregoing in mind, it is clear that the crimes at issue, causing catastrophe, involuntary manslaughter, and REAP, require the Commonwealth to establish Appellee possessed a *mens rea* of recklessness or gross negligence. In other words, Appellee's conduct must be either reckless or grossly negligent. A person acts "recklessly" with respect to a material element of an offense

when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and intent of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation.

18 Pa.C.S.A. § 302(b)(3). Gross negligence is not the equivalent of criminal negligence set forth in 18 Pa.C.S.A. § 302(b)(4). Instead, "the concept of gross negligence is encompassed within the concept of recklessness set forth in Section 302(b)(3)."[5] ***Commonwealth v. Matroni***, 923 A.2d 444, 448 (Pa. Super. 2007). Thus, recklessness "implicates knowledge in two ways: (1) the actor must consciously (*i.e.*, with knowledge) disregard a substantial and unjustifiable risk; and (2) the risk that the actor disregards is measured by the circumstances known to the actor." ***Commonwealth v. Sittler***, 144 A.3d 156, 164 (Pa. Super. 2016). "Conscious disregard" of a risk, in turn, "involves first becoming aware of the risk and then choosing to proceed in spite of the risk." ***Commonwealth v. Huggins***, 836 A.2d 862, 865 (Pa. 2003); ***see also Commonwealth v. Vogelsong***, 90 A.3d 717, 719 (Pa. Super. 2014) (recklessness requires conscious action or inaction that creates substantial risk of harm to others, whereas negligence suggests unconscious inadvertence).

Here, the Commonwealth argues that Judge McDermott erred in relying upon ***Commonwealth v. Karner***, 193 A.3d 986 (Pa. Super. 2018), and

---

[5] Because recklessness and gross negligence are equivalent states of mind for the crimes at bar, we refer to the *mens rea* requirement simply as recklessness.

*Commonwealth v. Wyatt*, 203 A.3d 1115 (Pa. Super. 2019), to support the application of the clearly erroneous exception to the coordinate jurisdiction rule. *See* Commonwealth Brief at 13-14. The Commonwealth maintains that *Huggins* is controlling and that *Karner* and *Wyatt* are inapposite because they are "ordinary traffic accident cases in which evidence of more than ordinary negligence was absent." *Id.* We agree.

In *Karner*, the defendant's Ford pickup truck rear-ended a Honda sedan, killing its passenger and severely injuring its driver. The Commonwealth charged the defendant with homicide by vehicle while driving under the influence ("DUI"), homicide by vehicle, aggravated assault by vehicle while DUI, aggravated assault by vehicle, simple assault, REAP, and various DUI and summary offenses. The charges against the defendant were held for trial after a preliminary hearing. The defendant then filed a petition for writ of *habeas corpus*, seeking dismissal of homicide by vehicle and aggravated assault by vehicle. In support, the defendant argued that the Commonwealth failed to establish a *prima facie* case relating to those two charges given the absence of evidence to satisfy the element of recklessness. The trial court agreed. On appeal, we affirmed. In so doing, we pointed out that the defendant "was traveling approximately 53 to 57 miles per hour in a posted 45 mile per hour zone on a relatively straight and clear roadway." *Karner*, 193 A.3d at 992 (citing the trial court opinion). The defendant exceeded the speed limit by only eight to twelve miles per hour in the area of the accident. *Id.* At the time of the accident, the Honda was turning left. *Id.*

Based on that, we concluded that the Commonwealth failed to produce any evidence that the defendant "acted with the criminal recklessness or gross negligence needed" to support the charges of homicide by vehicle and aggravated assault by vehicle.[6] *Id.* at 993.

In **Wyatt**, the defendant was driving a tractor-trailer southbound on Interstate 380 when he crossed the grassy median separating the north- and southbound lanes and struck a northbound tractor-trailer and a passenger bus. As a result of the accident, three people died and five were seriously injured. The Commonwealth charged the defendant with, *inter alia*, eight counts of aggravated assault by vehicle, three counts of homicide by vehicle, three counts of involuntary manslaughter, and 17 counts of REAP. The defendant filed a *habeas corpus* petition, arguing that the Commonwealth's *prima facie* evidence for the *mens rea* requirement of recklessness was insufficient. The trial court conducted a hearing, at which the Commonwealth introduced the Collision and Accident Reconstruction Specialist ("CARS") report. The CARS report concluded that speed, weather conditions and mechanical defects were not contributing factors to the vehicle collision. The Commonwealth also presented a GPS report from a device that recorded certain periodic driving statistics from the defendant's tractor-trailer. The GPS report ruled out speed as a contributing factor. In addition, the

---

[6] We excluded as irrelevant any evidence relating to the defendant's intoxication because the charges at issue, homicide by vehicle and aggravated assault by vehicle, expressly exempt an inquiry into DUI. **Karner**, 193 A.3d at 889 n.2.

Commonwealth introduced the defendant's phone records. He had received four texts, but did not send any texts until after the crash. Finally, a Commonwealth witness conceded that (1) there was no evidence of erratic driving prior to the collision, (2) there was a lack of evidence to develop a theory of distracted driving, and (3) the defendant's version of the events—that he had blacked out and does not remember the collision—if true, was a possible, non-criminal explanation. The trial court granted the petition. We affirmed the grant concluding, "[A]ny reason proffered by the Commonwealth for this collision, based on the evidence presented, is mere speculation." *Wyatt*, 203 A.3d at 1120.

In *Huggins*, the defendant was operating a van carrying twenty-one children, some crowded into the fifteen passenger seats and some seated on the floor. *Huggins*, 836 A.2d at 863–64. The defendant admitted "he fell asleep" and claimed "he awoke just before the van collided with the rear end of" a sedan in front of him. *Id.* at 863. The driver of the sedan testified he was "traveling at approximately sixty to sixty-five miles per hour" in the left lane and "did not see the van until the collision." *Id.* The defendant's approximate speed was at least 78 mph, well in excess of the posted speed limit of 55 mph. *Id.* at 863-64. Upon striking the sedan, the van veered right across the right travel lane, hit an embankment, flipped, and came to rest on its passenger side, killing two of the children in the van. *Id.*

The defendant was charged with multiple counts, including homicide by vehicle and involuntary manslaughter. Following a preliminary hearing, all

charges were bound over for trial. The defendant filed an omnibus pretrial motion, seeking, *inter alia*, *habeas corpus* relief. ***Id.*** at 864. The trial court granted limited relief and dismissed, among other things, the charges for involuntary manslaughter. The court concluded, in relevant part, that the Commonwealth failed to establish a *prima facie* case of recklessness. ***Id.*** This Court affirmed the dismissal of the involuntary manslaughter counts. ***Id.*** at 864–65. Specifically, we concluded the Commonwealth's evidence did not indicate that the defendant "'had reason to believe he was dangerously tired before falling asleep.'" ***Id.*** at 865.

The Pennsylvania Supreme Court granted allowance of appeal and reversed this Court's order. ***Id.*** at 863. The Court reasoned:

> A motor vehicle can be a dangerous instrumentality. Driving is a correspondingly heavily regulated privilege, both as to licensure and the rules of the road, the regulation being a necessary concomitant of the dangers to self and others inherent in driving. The danger increases with the speed at which a vehicle is operated, since speed both reduces reaction times and heightens the consequences of any collision. The danger also may increase if other safety measures are ignored-whether those measures involve vehicle maintenance, internal safety features such as seating capacity or restraints, or the rules of the road. No driver can get behind the wheel without an acute awareness of the responsible post of duty he is assuming.
>
> Losing consciousness at the wheel differs in kind from the acts of momentary inadvertence or inattention that often occasion car accidents and are commonly encompassed in the term "negligence" in the tort arena. A momentary lapse leaves the driver unprepared for the unexpected or extraordinary. A loss of consciousness, on the other hand, leaves one totally unprepared even for the ordinary requirements for safe driving. Drivers have an unflagging duty either to remain vigilant and awake or to immediately desist from driving. It is therefore not surprising that this Court, like many other courts, has deemed the act of falling asleep at the wheel alone to be enough to raise a jury question of negligence in the tort arena.

- 23 -

> [The defendant] appears to dispute this proposition, suggesting that without affirmative evidence from the Commonwealth that he had some warning that sleep was coming, little or no inference of negligence or recklessness may be drawn from the admitted fact that he fell asleep. Of course, [the defendant] is in the best and perhaps only position to know if the common signs of fatigue and impending sleep came upon him, which he ignored; the Commonwealth was not required to obtain a confession from [the defendant] in order to make out its *prima facie* case. Rather, the Commonwealth could rely upon the fact that it is common knowledge that sleep is preceded by some internal warning.

*Id.* at 869 (citations and quotation marks omitted). The Court, however, did "not resolve the question of whether falling asleep alone is enough to raise a jury question of recklessness" and summarized the **additional circumstances** evincing the defendant's "conscious disregard of the serious risk involved" in that case. *Id.* at 870. Those circumstances included having a number of children as passengers in excess of the van's capacity and the driver's excessive speed, both of which were in his "knowledge and control" and "increased the risk of collision, injury, and death." *Id.* at 870–71.

Unlike in **Karner** or **Wyatt**, the Commonwealth relied on more than simply Appellee's speed in establishing the element of recklessness. As in **Huggins**, it presented additional circumstances evincing Appellee's conscious disregard of the serious risk involved. The evidence adduced at the preliminary hearing reveals that Appellee was an experienced engineer. He passed rigorous training and testing before being permitted by Amtrak to operate a train by himself. Appellee was trained to know and memorize the physical characteristics of each portion of a route, including the route he travelled on the night of the derailment, for purposes of maintaining awareness of his location. Appellee also was trained to know the speed limits

on each portion of a route, including the route he traveled on the night of the derailment. Indeed, Appellee passed a test, demonstrating his knowledge and memorization of the physical characteristics of and speed limits along the route at issue. N.T. Preliminary Hearing, 9/12/17, at 136 (Appellant eventually passed a written test demonstrating that he knew "the physical characteristics, the signals, the speeds, the curves" the train would encounter.). As the Commonwealth points out, unlike the defendants in *Karner* or *Wyatt*, Appellee was not required to steer the train or monitor the constantly changing speeds and positions of other vehicles. Rather, "[h]is task was merely to know where [Train 188] was, the safe speed for that location, and to remain at or under that speed." Commonwealth's Brief at 18-19.

Yet, despite his extensive training and qualifications, on the night of the derailment, Appellee manually accelerated Train 188 after the Clearfield Curve, reaching a top speed of 106 mph in an 80-mph zone, just prior to entering the Frankford Curve, a difficult S-shaped curve. *See* N.T. Preliminary Hearing, 9/12/17, at 168-69 (Appellee had moved the throttle "all the way into full power."). As he entered the Frankford Curve, where the speed limit is 50 mph, he applied the brakes, managing only to reduce Train 188's speed to 104 mph. That is, he was operating Train 188 at more than twice the speed limit at the time it derailed at the Frankford Junction, killing eight people and seriously injuring numerous others.

After the derailment, according to the Commonwealth's evidence, Appellee informed an injured passenger that they "were at Frankford Junction" and had travelled on Train 188. *Id.* at 75. His awareness, however, seemingly faded thereafter. At the hospital, according to Detective Knoll's testimony, Appellee asked "a group of people by the nurses and doctors, are we in New York?" *Id.* at 116. As the Commonwealth aptly notes, "[f]abrication of false and contradictory statements by the accused is evidence from which a jury may infer that they were made with the intent to mislead police and are indicative of guilt." *Commonwealth v. Donnelly*, 653 A.2d 35, 37 (Pa. Super. 1995). Regardless, the resolution of such conflict is best left to the discretion of the factfinder. To reiterate, the weight and credibility of the evidence are not factors at this stage, *see Marti*, *supra*, and the sole question for purposes of *habeas* relief is whether "there is sufficient evidence to establish that a crime was committed and a probability that the defendant was connected therewith." *Commonwealth v. Melvin*, 103 A.3d 1, 35 (Pa. Super. 2014).

Here, given his extensive training and experience and despite having 250 passengers aboard, Appellee consciously disregarded a substantial and unjustifiable risk of derailment. *See Commonwealth v. Fabian*, 60 A.3d 146, 154-56 (Pa. Super. 2013) (considering the circumstances of defendant's training and professional responsibility, we held that sufficient evidence supported the conclusion that defendant acted recklessly in inspecting and repairing brakes on a school van that crashed with students on board, killing

- 26 -

one and injuring four), *appeal denied*, 69 A.3d 600 (Pa. 2013). As stated, prior to reaching the Frankford Junction, Appellee manually accelerated Train 188 to 106 mph in an 80-mph zone. Upon entering the Frankford Curve, described as a difficult S-shaped curve where the posted speed limit is 50 mph, Appellee managed only to reduce Train 188's speed to 104 mph. He was going twice over the speed limit. Moreover, the evidence indicates that, based on his training and experience, Appellee was aware of the risk inherent in navigating the Frankford Curve. Differently put, he was on notice of the physical characteristics of and speed along the Frankford Curve because he had travelled through the Frankford Curve 25 times at an average speed of 49 mph. N.T. Preliminary Hearing, 9/12/17, at 233-34. Accordingly, we conclude that the Commonwealth offered sufficient evidence at the preliminary hearing from which a finder of fact could conclude that Appellee acted recklessly in causing the derailment of Train 188.[7]   **See Commonwealth v. Mayberry**, 138 A. 686, 687 (Pa. 1927) (noting that the proper charge was involuntary manslaughter where the cause of the victim's death was "the failure of [the] defendant to make the turn with the curve of

---

[7] To the extent Appellee cites, *inter alia*, **Commonwealth v. Agnew**, 398 A.2d 209 (Pa. Super. 1979), **Commonwealth v. Bullick**, 830 A.2d 998 (Pa. Super. 2003), **Commonwealth v. Cienowski**, 434 A.2d 821 (Pa. Super. 1981), **Commonwealth v. Gilliand**, 422 A.2d 206 (Pa. Super. 1980), or **Commonwealth v. Greenberg**, 885 A.2d 1025 (Pa. Super. 2005), to refute the Commonwealth's argument, such cases are readily distinguishable as they do not address the central issue raised herein implicating the sufficiency of evidence at the pretrial juncture. Those cases were decided on appeal following the entry of a judgment of sentence.

street . . . due to his excessive, negligent, and unlawful speed."). The trial court, therefore, erred in ruling that the Commonwealth failed to establish a *prima facie* case, especially as it relates to the *mens rea* requirement of recklessness.

We additionally note that in arriving at its conclusion, the trial court impermissibly engaged in weighing of evidence and credibility determinations. In concluding that Appellee was entitled to *habeas* relief, it appears the trial court made the following findings: Appellee (1) was affected by "reports of a nearby SEPTA train being hit with a projectile," (2) was unaware "that he was approaching the Frankford Curve," (3) did not "actually kn[o]w his location on the track," and (4) "was not consciously aware of his speed with respect to his location until well after he reached the point of no return." Trial Court Opinion, 9/23/19, at 12-15. The *prima facie* evidence produced by the Commonwealth can contradict each of these findings. At this stage of the proceedings, the Commonwealth's evidence must be accepted as true. The weight and credibility of the evidence are not factors at this pretrial stage. **See Marti**, **supra**. The sole question for purposes of *habeas* relief is whether "there is sufficient evidence to establish that a crime was committed and a probability that the defendant was connected therewith." **Melvin**, 103 A.3d at 35. The Commonwealth answered that question to Appellee's detriment, as we explained above.

Similarly, Appellee's argument that he was distracted by the SEPTA incident involving a projectile and, as a result, lost situational awareness, is

improper at this juncture, as it is a defense theory that must be explored and litigated at trial. As explained, the sole question raised by Appellee's request for *habeas* relief is whether "there is sufficient evidence to establish that a crime was committed and a probability that the defendant was connected therewith." ***See Melvin***, ***supra*** at 35. Whether Appellee lost situational awareness touches upon the weight and credibility of the evidence, which are non-factors at this stage of the proceeding. ***See Marti***, ***supra***.

Based on the foregoing, we conclude that Judge McDermott violated the coordinate jurisdiction rule. Judge Lewis' prior determination that the Commonwealth presented *prima facie* evidence for all charges was not clearly erroneous, manifestly unjust, or plainly intolerable. In overruling Judge Lewis, Judge McDermott further erred by weighing the evidence and engaging in credibility determinations. The Commonwealth is entitled to try this case before an impartial jury. We, therefore, reverse the trial court's July 23, 2019 order and remand this case to the trial court for further proceedings consistent with this opinion.[8]

Order reversed. Case remanded. Jurisdiction relinquished.

---

[8] Given our analysis with respect to the Commonwealth's first issue, we need not address its second issue separately, as it too implicates the sufficiency of the evidence at the preliminary hearing stage.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>5/14/20</u>